**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

JACOB REINKRAUT, STEVE SMITH, MATTHEW CHAPMAN, SARI MEDINA, JOSEPH MAGEE, JT WILLCUTT, ROBERT ZAUGG, ROBERT SECCO, JOHN and LAURA KOTOS, MAURICE WILSON, KEVIN MORRIS, JAMES MURRAY and ANTHONY SOLIMANDO on behalf of themselves and the Putative Class,

　　　　Plaintiffs,

　　　　　　v.

FCA US LLC, a Delaware Limited Liability Company,

　　　　Defendant.

Civil Action No. 23-02792

**OPINION**

September 5, 2024

**SEMPER**, District Judge.

　　　Before the Court is Defendant FCA US LLC's ("Defendant" or "FCA") motion to dismiss Plaintiffs' Second Amended Complaint (ECF 27, "SAC") pursuant to Federal Rule of Civil Procedure 9(b), 12(b)(1), and 12(b)(6). (ECF 30-1, "Def. Br.") Plaintiffs filed a brief in opposition. (ECF 36, "Opp.") Defendant filed a reply. (ECF 38, "Reply.") The Court reviewed the Plaintiffs' SAC and the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's motion to dismiss is **GRANTED in part** and **DENIED in part**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

This putative class action arises from an alleged Windshield Defect present in certain Jeep vehicles. (SAC ¶¶ 1-2.) Plaintiffs Jacob Reinkraut, Matthew Chapman, Sari Medina, JT Willcutt, Robert Zaugg, Robert Secco, John and Laura Kotos, Maurice Wilson, Kevin Morris, and Anthony Solimando bring this action on behalf of themselves and all similarly-situated individuals and entities (the "Class") who own, lease, or have owned or leased Jeep Wranglers and Gladiators for model years 2016 to the present (hereinafter, the "Class Vehicles") manufactured and/or sold by the Defendant, FCA US LLC (hereinafter "Defendant" or "FCA"). (*Id.* ¶ 1.)

Defendant designs, manufactures, and warrants the Class Vehicles. (*Id.*) Defendant advertises the Class Vehicles as safe, dependable, and durable. (*Id.*) However, the Class Vehicles are designed and manufactured with one or more manufacturing and design defects that make the Class Vehicles' windshields "extremely prone to cracking, fracturing, or chipping." (*Id.* ¶ 2.) The Windshield Defect causes "the front windshield to crack, fracture or chip for no reason, or under circumstances that would not cause a normal, non-defective windshield to become impaired and fail, such as during use of the defroster or having a small pebble from the road bounce up onto the windshield." (*Id.* ¶ 3.) Plaintiffs allege the Windshield Defect presents an unreasonable safety hazard due to its impact on driver visibility, Class Vehicles' structural integrity, and driver and passenger safety. (*Id.* ¶ 4.)

### A.      Plaintiffs' Individual Allegations

**Plaintiff Reinkraut**: On or about June 6, 2022, Plaintiff Reinkraut, a New Jersey citizen, purchased a pre-owned 2016 four-door, Jeep Wrangler Rubicon, with 33,548 miles, VIN number

---

[1] When considering a motion to dismiss under Rule 12(b)(6), the Court is obligated to accept as true allegations in the complaint and all reasonable inferences that can be drawn therefrom. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). Accordingly, the facts are taken from Plaintiffs' Second Amended Complaint.

1C4BJWFG9GL274352 online from Lenz Auto for $40,492. (*Id.* ¶ 29.) Lenz Auto drove the vehicle from Wisconsin and delivered it to Reinkraut in New Jersey. (*Id.*) Lenz Auto then took Reinkraut's 2009 Jeep from his home in New Jersey and paid him a trade-in value of $11,000. (*Id.*) Prior to purchase, from his home in New Jersey, Reinkraut conducted online research on the 2016 four-door, Jeep Wrangler Rubicon on the Jeep website. (*Id.* ¶ 30.) Reinkraut reviewed and e-signed the purchase documents from his home in New Jersey and electronically sent them back from New Jersey to Lenz Auto. (*Id.*) Reinkraut's vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant FCA. (*Id.* ¶ 31.)

On January 3, 2023, while Reinkraut drove his vehicle in New Jersey, he noticed the windshield was cracked. (*Id.* ¶ 32.) He had not seen anything impact the windshield. (*Id.*) "He was surprised the windshield cracked because he knew that the vehicle had come equipped with Gorilla Glass." (*Id.*) Mopar, Chrysler's parts and accessories division, offers a Gorilla Glass windshield kit for the Jeep Wrangler. (*Id.*) Reinkraut's insurance agent in New Jersey recommended that he contact Quest Auto Glass to replace the windshield. (*Id.* ¶ 34.) Reinkraut paid $625 for a replacement windshield in New Jersey. (*Id.* ¶ 35.)

**Plaintiff Chapman**: On January 15, 2022, Plaintiff Chapman, a Florida citizen, purchased a new 2021 Jeep Gladiator Overland 4x4, VIN number 1C6HJTFG9ML621450 for $55,300.00 from Jim Browne Chrysler Jeep Dodge Ram in Tampa, Florida. (*Id.* ¶ 42.) The vehicle had 10 miles on it at the time of purchase, currently has 13,356 miles, and is still under warranty. (*Id.*) Prior to purchase, Chapman conducted online research regarding the vehicle that he ultimately purchased. (*Id.* ¶ 43.) Chapman's vehicle was designed, manufactured, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 44.) Chapman's vehicle was sold with Corning Gorilla Glass, listed on the Monroney sticker as an extra cost of $195. (*Id.* ¶ 45.)

3

On or about December 22, 2022, Chapman observed that his windshield was cracked in two places. (*Id.* ¶ 46.) "There was no cause for this as nothing hit the windshield and there were no marks indicating that a rock or pebble had hit the windshield." (*Id.*) Initially, Chapman tried to have the windshield replaced at a Jeep dealership; however, he was advised that the dealership he called did not deal with glass. (*Id.* ¶ 47.) Consequently, on December 22, 2022, he called Safelite Auto Glass. (*Id.*) Safelite came to his home and replaced the windshield. (*Id.*) His insurance company covered the cost of the repair. (*Id.*)

**Plaintiff Medina**: In March 2021, Plaintiff Medina, a California citizen, leased a new 2021 Jeep Wrangler, VIN number 1C4HJXEM0MW565825 from Glendale Jeep Ram Dodge in Glendale, California. (*Id.* ¶ 48.) The vehicle currently has approximately 35,000 miles and is still under warranty. (*Id.*) Prior to purchase, Medina conducted online research regarding the vehicle she ultimately purchased. (*Id.* ¶ 49.) Medina's vehicle was designed, manufactured, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 50.) On May 22, 2022, Medina woke up and saw her windshield was cracked. (*Id.* ¶ 51.) "There was no cause for this as nothing hit the windshield and there were no marks indicating that a rock or pebble had hit the windshield." (*Id.*) Medina inquired about having the windshield repaired by the dealership. (*Id.* ¶ 52.) She was informed that the windshield repair was not covered, and she paid $465.00 out of pocket for a new windshield. (*Id.*)

**Plaintiff Wilcutt**: On August 31, 2021, Plaintiff Willcutt, a Washington state citizen, purchased a new 2021 Jeep Gladiator Overland 4x4, VIN number 1C6HJTFG6ML568903 for $55,270.00 (with taxes and fees, $60,100.21) from Olympia Chrysler Jeep, in Olympia Washington. (*Id.* ¶ 59.) The vehicle has 18,614 miles and is still under warranty. (*Id.*) Prior to purchase, Willcutt conducted online research regarding the vehicle that he ultimately purchased.

4

(*Id.* ¶ 60.) Willcut's vehicle was designed, manufactured, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 61.) Within a week of bringing the vehicle home, he noticed the windshield had cracked. (*Id.* ¶ 62.) "There was no cause for this as nothing hit the windshield and there were no marks indicating that a rock or pebble had hit the windshield." (*Id.*) He has been driving the vehicle with a crack in the windshield ever since. (*Id.*)

**Plaintiff Zaugg**: On July 30, 2021, Plaintiff Zaugg, a Utah citizen, purchased a 2021 Jeep Wrangler 4xe High Altitude, VIN 1C4JJXP65MW716691, for $64,425 from Salt Lake Valley Jeep. (*Id.* ¶ 63.) The current mileage is 28,000. (*Id.*) In late November 2021, when his vehicle had 6,000 miles on it, Zaugg warmed up the Jeep in his driveway so that he could drive his children to school. (*Id.* ¶ 64.) He noticed a crack form at the bottom middle section of the windshield and rapidly spread to the right side of the windshield. (*Id.*) At the time of the initial cracking, Zaugg's vehicle was parked, there were no signs of impact from a rock, there was no "chip anywhere along the cracking[,]" and the windshield was clear of ice and snow. (*Id.*) Each time Zaugg used the front defroster during cold weather, cracking progressed. (*Id.*) Zaugg stopped using the defroster while warming the vehicle. (*Id.*)

Zaugg brought the vehicle back to Salt Lake Valley Jeep. (*Id.* ¶ 65.) He was told that since he did not buy windshield protection at the time of purchase, he was out of luck in terms of repairs. (*Id.*) Zaugg has since taken the vehicle to another dealership for servicing. (*Id.*) An employee from this dealership told Zaugg that he had seen a lot of the "newer model" Wranglers in for repairs for windshields with cracking in the exact same spot. (*Id.*) Zaugg saw on internet forums that many other Jeep owners have had the same experience. (*Id.*) To date, Zaugg has not replaced his windshield "because he does not want to incur the additional cost when the windshield will just crack again due to defects in Jeep's manufacturing process." (*Id.* ¶ 66.)

**Plaintiff Secco**: On or about June 12, 2020, Plaintiff Secco, an Italian citizen and Virginia resident, purchased a 2020 Jeep Wrangler, VIN C4HJXDN4LW223206 for approximately $48,000 prior to trade-in value, through a Retail Installment Sales Contract with Hall Chrysler Jeep Dodge in Virginia Beach, Virginia. (*Id.* ¶ 67.) Prior to purchase, Secco conducted online research regarding the vehicle that he ultimately purchased. (*Id.* ¶ 68.) Secco's vehicle was designed, manufactured, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 69.) Since purchasing the vehicle, Secco has experienced four broken windshields. (*Id.* ¶ 70.)

In January 2023, a small pebble bounced off Secco's vehicle's windshield, causing a small crack. (*Id.* ¶ 71.) Safelite filled the crack with resin, but it did not charge Secco for the service. (*Id.*) On August 9, 2023, another small pebble bounced off the windshield, but this time the windshield cracked from top to bottom. (*Id.* ¶ 72.) Secco filed a claim with his insurance company, and he was authorized to replace the glass via Safelite. (*Id.*) The total price to repair with resin was $754.38, but Secco only paid the $50 deductible, and his insurance company paid the rest. (*Id.*) Two weeks, later, on August 21, 2023, while he was driving, he saw a crack that traveled from the top of the windshield to the bottom. (*Id.* ¶ 73.) He took the vehicle to Low Price Auto Glass in Virginia Beach, and the windshield was replaced at a cost of $490. (*Id.*) Four days later, the windshield cracked for a fourth time. (*Id.* ¶ 74.) As of the SAC's filing, Secco's Jeep had less than 25,000 miles. (*Id.* ¶ 75.) Secco is waiting until he needs to take the car for inspection before incurring the cost of another windshield replacement. (*Id.* ¶ 77.)

**Plaintiffs Laura and John Kotos**: On March 4, 2016, Plaintiff Laura Kotos, an Indiana citizen, purchased a new 2016 Jeep Wrangler VIN 1CAJWAG6GL136366 for $30,841.00 (prior to aftermarkets and preferred maintenance only) from Thomas Dodge Chrysler Jeep of Highland Inc. in Highland, Indiana. (*Id.* ¶ 78.) Since purchasing the vehicle, the windshield has been replaced

four times. (*Id.*) Most recently, the windshield cracked when a small object hit the windshield while driving. (*Id.*) The windshield was replaced by Lowell Auto Glass, in Lowell, Indiana, for $300.00. (*Id.*) The vehicle is now owned by John Kotos, Laura's husband. (*Id.*) He recently experienced another crack of the windshield caused by an object striking the windshield. (*Id.*)

On June 29, 2023, Laura Kotos purchased a new 2023 Jeep Wrangler Sahara, VIN 1C4HJXEJG3PW655503 at a purchase price of $56,010.00 from Bozak Motors in Merrillville, Indiana. (*Id.* ¶ 79.) John and Laura Kotos researched the vehicle prior to purchase. (*Id.* ¶ 80.) Their vehicles were designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 81.)

Two weeks after purchase, while Laura Kotos drove on the expressway, the 2023 Wrangler's windshield cracked. (*Id.* ¶ 82.) The crack progressively worsened as she drove home. (*Id.*) Kotos called the dealership requesting repair. (*Id.*) Kotos also called her insurance company. (*Id.*) The vehicle remained parked in the driveway until repair. (*Id.*) On approximately August 25, 2023, the windshield was replaced with remittance of a $500 deductible under her insurance policy. (*Id.*)

Since then, the windshield cracked again, for no apparent reason. (*Id.*) Laura Kotos had driven to work and parked her vehicle in the Ford Motor Company employee parking lot. (*Id.*) Upon arrival, her windshield was intact. (*Id.*) When her shift ended and she returned to the lot, she discovered the windshield was cracked. (*Id.*) The windshield remains cracked. (*Id.*)

**Plaintiff Wilson:** On April 22, 2023, Maurice Wilson, a Texas citizen, purchased a 2023 Jeep Gladiator Texas Trail edition, VIN1C6HJTAG0PL530983 from Classic Chrysler Dodge Jeep Ram Fiat, in Arlington, Texas. (*Id.* ¶ 83.) The purchase price before rebates, trade-in, and discounts was $49,170.00 and $39,585.06 after these reductions were taken. (*Id.*) The current vehicle

7

mileage is 8,100 miles. (*Id.* ¶ 84.) When Wilson purchased the vehicle, the dealership needed to replace the windshield before it could be delivered. (*Id.* ¶ 85.) The replacement glass arrived broken, so Wilson had to wait over a week before he could take possession of the vehicle. (*Id.*) Prior to purchase, Wilson researched the vehicle he ultimately purchased on the Jeep sales site. (*Id.* ¶ 86.) Wilson's vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 87.)

On July 14, 2023, while traveling through New Mexico, the windshield was struck by something in the upper-left corner, significantly damaging the glass. (*Id.* ¶ 88.) Wilson took his vehicle to the dealer to inquire whether the Jeep warranty would cover replacement, but due to impact damage, it was not covered. (*Id.*) The cost was not high enough to use his insurance, so Wilson paid out of pocket. (*Id.*) On July 24, 2023, Wilson had OEM glass installed at Safelite Auto Glass for $532.99. (*Id.*)

On August 9, 2023, while sitting in his driveway preparing to back out, Wilson heard a "crack" and saw a large crack running from the base of the glass up and across the new windshield. (*Id.* ¶ 89.) He took the vehicle back to Safelite. (*Id.*) They told Wilson the crack resulted from impact. (*Id.*) However, Wilson alleges the crack was not caused by impact since the crack occurred while he was stationary in his driveway. (*Id.*) After several calls and a meeting with a Safelite trainer, the trainer informed Wilson that he too had issues with the glass in his Jeep. (*Id.*) "He informed Wilson that Jeeps were coming off the transport trucks with broken windshields, and that they see several Jeeps a day for just this problem." (*Id.*) The trainer informed Wilson that he eventually went to aftermarket replacement glass, and his vehicle has since been fine. (*Id.*) On August 18, 2023, Wilson paid $175.76 for an aftermarket glass replacement. (*Id.*) Between April 22, 2023 and September 2023, Wilson had his windshield replaced three times. (*Id.* ¶ 90.)

**Plaintiff Morris:** On May 12, 2023, Plaintiff Morris, a Maryland citizen, purchased a new 2023 Jeep Grand Cherokee from Darcars Jeep Chrysler, VIN 1C4RJJBG3P8835994, in Waldorf, Maryland, financing a total of $57,342.20. (*Id.* ¶ 91.) The vehicle came with a rain sensing windshield. (*Id.*) Prior to purchase, Morris did online research regarding the vehicle he ultimately purchased on the Jeep sales site. (*Id.* ¶ 92.) Morris's vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 93.)

On June 14, 2023, a small pebble struck the windshield, leaving a chip the size of a pencil eraser. (*Id.* ¶ 94.) Within five days, while the vehicle was stored in a garage, the windshield cracked completely across with two distinct veins. (*Id.*) Morris took the vehicle to the dealer, who refused to make the repair because a pebble caused the point of impact. (*Id.*) Morris argued that the expansive cracks, which spread across the entire windshield, seemed consistent with the experiences of other Jeep owners. (*Id.*) The dealer stated it was only aware of Jeep Compacts having windshield problems. (*Id.*) The dealer explained that "corporate" had not provided any directives for handling windshield complaints. (*Id.*) Consequently, Morris filed a claim with his insurer, Geico, and paid a $50 deductible for the repairs. (*Id.* ¶ 95.)

**Plaintiff Solimando:** In May 2021, Plaintiff Solimando, a New Jersey citizen, purchased a pre-owned 2020 Jeep Wrangler Sahara, VIN 1C4HJXENOLW147837, from Route 130 Chrysler Dodge Jeep Ram in Robbinsville, New Jersey for $35,000. (*Id.* ¶ 102.) At the time of purchase, the vehicle had 12,000 miles. (*Id.*) Prior to purchase, Solimando did online research regarding the vehicle he purchased on the Jeep sales site. (*Id.* ¶ 103.) Solimando's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranty by Defendant. (*Id.* ¶ 104.) Shortly after purchasing his vehicle, Solimando noticed the windshield was "unusually prone to small pebbles hitting the windshield leading to small chips." (*Id.* ¶ 105.) Solimando purchased a

windshield repair kit at his own expense. (*Id.* ¶ 106.) He made repairs to the windshield himself because the dealer will not replace the windshield. (*Id.*)

### B.    Defendant's Knowledge

Plaintiffs allege Defendant knew of the Windshield Defect and the dangers associated with it. (*Id.* ¶ 133.) Plaintiffs assert that Defendant has acknowledged the importance of the windshield in its vehicles in its collision repair newsletter stating:

> The role of the windshield is a lot more complex than simply allowing a view of the road ahead. It is considered a structural part of the vehicle as it contributes to the strength of the roof and A-pillars. The windshield helps to manage collision energy and has become an integral part of several advanced safety systems.

(*Id.* ¶ 126 (citing https://rts.i-car.com/collision-repair-news/crn-438.html).) Plaintiffs state that accordingly, Defendant knew the Windshield Defect adversely impacted the safety and integrity of the Class Vehicles. (*Id.* ¶ 127.)

Plaintiffs allege Defendant failed to inform Class Vehicle owners and lessees prior to purchase that the windshields of Jeep Wranglers, Gladiators, and Grand Cherokees were subject to premature cracking, fracturing, or chipping, would fail shortly after expiration of the express warranty, or would be denied warranty coverage based upon exclusions in the warranty. (*Id.* ¶ 134.) They also allege that Defendant failed to inform Class Vehicle owners and lessees at the time of purchase that the windshield in their Class Vehicles had been inadequately designed, manufactured, and tested prior to placing the car in production and the time of sale. (*Id.* ¶ 135.) Plaintiffs generally state that Defendant misrepresented by affirmative conduct and/or omission and/or fraudulent concealment that the Windshield Defect existed. (*Id.* ¶ 134.)

Plaintiffs assert "[t]here is substantial evidence from numerous sources that FCA was aware that there were problems with Jeep Wrangler, Gladiator and Grand Cherokee windshields prior to

Plaintiffs purchasing their Class Vehicles." (*Id.* ¶ 136.) First, Plaintiffs allege that because Defendant's parts supplier, Mopar, offered Mopar windshields made with Corning Gorilla Glass for Jeep Wranglers and Gladiators starting with model year 2007, Defendant was "aware of the problem." (*Id.* ¶ 137.) Second, Plaintiffs assert that "Defendant also knew, or reasonably should have known, of the Defect based upon the number of complaints it received from its dealerships and service shops." (*Id.* ¶ 138.) Through dealers' record-keeping and computer systems that Defendant has access to, "Defendant has the ability to and does interact with Jeep dealers on a regular basis so as to be fully informed and troubleshoot problems as soon as they arise. The common, serious windshield breakage problem in Jeep vehicles is one such problem." (*Id.*) Third, Plaintiffs allege that Defendant's "customer relations division regularly receives and responds to customer calls, emails, and other correspondence concerning, *inter alia*, product defects. Through these sources, FCA was made aware, or reasonably should have been made aware, of the Windshield Defect, which is a problem that has persisted for years." (*Id.* ¶ 140.) Fourth, Plaintiffs assert that numerous complaints posted on the National Highway Traffic Safety Administration database, which Defendant had an obligation to monitor, demonstrate Defendant was aware of the Windshield Defect. (*Id.* ¶¶ 141-43.)

     **C.**    **The Warranty**

The SAC states that FCA's Basic Limited Warranty lasts for 36 months from the date it begins or 36,000 miles on the odometer, whichever occurs first. (*Id.* ¶ 149.) However, FCA limits the warranty on the windshield for only 12 months or 12,000 miles. (*Id.*) Moreover, FCA explicitly excludes what it refers to as "Environmental Factors" and provides, in relevant part: "Your warranties do not cover conditions resulting from anything impacting the vehicle. This includes cracks and chips in glass, scratches and chips in painted surfaces, or damage from collision." (*Id.*)

Plaintiffs assert Defendant's written warranties are procedurally and substantively unconscionable. (*Id.* ¶ 119.) They allege the warranties "are offered on a take-it-or leave-it basis without any input from consumers in a 'boiler-plate' printed forms that are oppressive and surprise consumers." (*Id.*) They assert "FCA is in a superior bargaining position." (*Id.*) Plaintiffs allege the warranties are "substantially unconscionable because FCA knowingly and/or recklessly sold a defective product that was defective at the time of sale, without conspicuously informing consumers about the defects in the Windshield that would result in premature cracking, chipping and fracturing with little or no impact." (*Id.*) Plaintiffs also assert that the warranties' time limits "are grossly inadequate to protect Plaintiffs and Class members." (*Id.*) They also allege that the warranties' terms

> unreasonably favor Defendant by unreasonably limiting the time frame on each Warranty; a gross disparity in bargaining power existed as between Defendant and Plaintiffs and the Class members; Plaintiffs and Class members had no meaningful choice in determining those time limitations; and Defendant knew or should have known that the Windshields were defective at the time of sale and would fail prematurely requiring expensive and repeated replacements, thereby creating overly harsh and one-sided results due to a defect that FCA knew existed at the time of sale. In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit the express warranties in a manner that would exclude coverage for the Windshield Defect is unconscionable and any such effort to disclaim or otherwise limit liability for Defective Windshields is null and void as alleged above.

(*Id.* ¶ 120.)

## D.    The Present Action

Plaintiffs initiated this action on May 23, 2023. (ECF 1.) They twice filed an amended complaint. (ECF 9; ECF 27.) Plaintiffs' Second Amended Complaint asserts twenty-two counts, as follows:

- <u>Six common law claims:</u> Count 2: fraud; Count 3: fraudulent concealment; Count 4: breach of express warranty; Count 5: breach of implied warranty; Count 7: unjust enrichment; and Count 8: negligent misrepresentation;

- <u>Two statutory express warranty claims:</u> Count 6: breach of written warranty under the Magnuson-Moss Warranty Act and Count 14: breach of express warranty under California's Song-Beverly Act;

- <u>One statutory implied warranty claim:</u> Count 15: breach of implied warranty under California's Song-Beverly Act; and

- <u>Thirteen statutory consumer protection claims:</u> Count 1: violation of New Jersey's Consumer Fraud Act; Count 9: violation of the North Carolina Unfair or Deceptive Trade Practices Act; Count 10: violation of the Florida Deceptive and Unfair Trade Practices Act; Count 11: violation of the California Consumers Legal Remedies Act; Count 12: violation of the California Unfair Competition Law; Count 13: violation of California's False Advertising Law; Count 16: violation of the Utah Consumer Sales Practices Act; Count 17: violation of the Washington Consumer Protection Act; Count 18: violation of Virginia's Consumer Protection Act; Count 19: violation of the Indiana Deceptive Consumer Sales Act; Count 20: violation of the Texas Deceptive Trade Practices Act; Count 21: violation of the Maryland Consumer Protection Act; and Count 22: violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.[2]

(*See generally* SAC ¶¶ 156-428.)

On November 17, 2023, Defendant moved to dismiss Plaintiffs' SAC in its entirety. (ECF 30-1, "Def. Br.") Plaintiffs filed a brief in opposition. (ECF 36, "Opp.") Defendant filed a reply. (ECF 38, "Reply.")

---

[2] On June 11, 2024, Plaintiffs Steve Smith, Joseph Magee, and James Murray voluntarily dismissed their claims against Defendant pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (ECF 47; ECF 48; ECF 49.) Accordingly, the Court will not address the North Carolina claim asserted by Smith (Count 9), the Pennsylvania claim asserted by Murray (Count 22), or the Florida claim as asserted by Magee (Count 10).

## II.     LEGAL STANDARD

### A.     Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss for lack of standing "because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). A motion to dismiss for lack of subject matter jurisdiction may either "attack the complaint on its face . . . [or] attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). "The former challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.'" *Id.* (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). "[A] factual challenge[] attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.'" *Davis*, 824 F.3d at 346 (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)).

Motions to dismiss for lack of standing are best understood as facial attacks. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) ("Defendants' Rule 12(b)(1) motions are properly understood as facial attacks because they contend that the [a]mended [c]omplaints lack sufficient factual allegations to establish standing."). In assessing a facial attack on subject matter jurisdiction under Rule 12(b)(1), courts must apply

the familiar 12(b)(6) standard. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) ("In evaluating whether a complaint adequately pleads the elements of standing, courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim[.]").

**B.      Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted[.]" For a complaint to survive dismissal under the Rule, it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Restatements of a claim's elements are legal conclusions, and therefore, not entitled to a presumption of truth. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210. Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state

"a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

**C.    Rule 9(b)**

"When a complaint involves allegations of fraud, a plaintiff must meet the heightened pleading requirements of Rule 9(b) to state a claim under Rule 12(b)(6)." *Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F. Supp. 3d 63, 68 (D.N.J. 2021) (citing *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014)); *see also* Fed. R. Civ. P. 9(b) (stating that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud," though conditions of the mind such as knowledge may be pled generally). "In order to satisfy Rule 9(b), a complaint must provide 'all of the essential factual background that would accompany the first paragraph of any newspaper story' — that is, the 'who, what, when, where and how' of the events at issue.'" *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). This standard has been relaxed slightly for fraudulent omission claims where pleading specific times and places may not be practicable and, instead, Rule 9(b) may be satisfied by "alleg[ing] what the omissions were, the person responsible for failing to disclose the information, the context of the omission and the manner in which it misled plaintiff and what defendant obtained through the fraud." *See Johansson v. Cent. Garden & Pet Co.*, 804 F. Supp. 2d 257, 264 (D.N.J. 2011) (quoting *Luppino v. Mercedes-Benz USA, LLC*, No. 09-5582, 2010 WL 3258259, at *7 (D.N.J. Aug. 16, 2010)).

**III.    DISCUSSION**

**A.    Standing**

Article III standing requires a plaintiff to show: (1) that she suffered a concrete, particularized, injury in fact that is actual or imminent; (2) that the defendant caused the injury;

and (3) the injury would likely be redressed by the requested judicial relief. *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022) (quoting *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020)). "Standing requires that the party seeking to invoke federal jurisdiction 'demonstrate standing for each claim he seeks to press'" and is not satisfied for one claim merely because it is related to another for which standing has been satisfied. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

### a. Nationwide Claims

Defendant argues the Court should dismiss the nationwide class allegations because Plaintiffs lack standing to assert claims on behalf of putative classes under the laws of states where no named plaintiff is located. (Def. Br. at 21-23.) "[T]here is disagreement in this district over whether plaintiffs in a class action may assert claims under the laws of states where the complaint does not allege connections between the named plaintiffs and those states." *Rains v. Jaguar Land Rover N. Am., LLC*, No. 22-4370, 2023 WL 6234411, at *4 (D.N.J. Sept. 26, 2023) (quoting *Cohen v. Subaru of Am., Inc.*, No. 20-08442, 2022 WL 721307, at *6 (D.N.J. Mar. 10, 2022)). The Court agrees with the authority finding plaintiffs must demonstrate standing for each claim they seek to assert. *Rains*, 2023 WL 6234411, at *4; *Snowdy v. Mercedes-Benz USA, LLC*, No. 23-1681, 2024 U.S. Dist. LEXIS 59302, at *20 (D.N.J. Apr. 1, 2024); *see also Ponzio v. Mercedes-Benz, USA, LLC*, 447 F. Supp. 3d 194, 223 (D.N.J. 2020). "The requirements for standing do not change because Plaintiffs fashion their claims in a purported nationwide class." *Tijerina v. Volkswagen Gp. of Am., Inc.*, No. 21-18755, 2023 U.S. Dist. LEXIS 187865, at *21 (D.N.J. Oct. 19, 2023) (citing *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) ("The requirements for standing do not change in the class action context.")). Indeed, "named

plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Tijerina*, 2023 U.S. Dist. LEXIS 187865, at *21 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks omitted)). Otherwise, "a plaintiff would be able to bring a class action complaint under the laws of nearly every state . . . without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis." *Ponzio*, 447 F Supp. 3d at 223. Therefore, Plaintiffs are limited to asserting claims on behalf of individuals in states where at least one named Plaintiff has standing for a claim. *See Tijerina*, 2023 U.S. Dist. LEXIS 187865, at *21; *Rains*, 2023 WL 6234411, at *4; *Cohen*, 2022 WL 721307, at *6; *Snowdy*, 2024 U.S. Dist. LEXIS 59302, at *20.

### b. Claims Related to Vehicles Not Purchased or Leased by Plaintiffs

Defendant argues that Plaintiffs lack standing to assert claims based on vehicles they did not own or lease. (Def. Br. at 18-21.) Plaintiffs assert that dismissal on such grounds would be premature. (Opp. at 14-16.) In *Kavon v. BMW of North America LLC*, 605 F. Supp. 3d 622 (D.N.J. 2022), Judge McNulty reasoned that named plaintiffs may satisfy the threshold standing issue for claims related to products they did not own or lease if they satisfy the factors enumerated by the Third Circuit in *Haas v. Pittsburgh National Bank*, 526 F.2d 1083, 1088-89 (3d Cir. 1975). *See Kavon*, 605 F. Supp. 3d at 630-31. "Under the *Haas* test, a plaintiff may have standing 'to assert claims on behalf of putative class members regarding products they did not personally purchase where (1) the basis of the claims is the same, (2) the products are closely related, and (3) the claims are against the same defendants.'" *Id.* at 630 (quoting *Cannon v. Ashburn Corp.*, No. 16-1452, 2016 U.S. Dist. LEXIS 169040, at *9 (D.N.J. Dec. 7, 2016) (citations omitted)). "The *Haas* test is

18

sufficient to satisfy the minimum threshold requirement of standing and comports with the overall goals of representative litigation." *Kavon*, 605 F. Supp. 3d at 630.

Therefore, this Court analyzes Plaintiffs' standing to bring claims on behalf of those who purchased different vehicle models under the *Haas* test. First, all Class Vehicles share the same factual basis: "windshields on these vehicles [are] extremely prone to cracking, fracturing, or chipping[.]" (SAC ¶ 2.) Second, Class Vehicles are all Jeep vehicles with the Windshield Defect, such that the Class Vehicles are all closely related. (*Id.* ¶ 1.) Third, Plaintiffs assert their claims against one defendant, FCA. (*Id.*) Therefore, the Court finds Plaintiffs have standing to bring claims on behalf of purchasers of all Class Vehicles. However, at the class certification stage, Plaintiffs have the burden of proving that the case is appropriately brought as a class action. *Kavon*, 605 F. Supp. 3d at 631.

**B.      Choice of Law**

Defendant argues that this Court should engage in a choice of law analysis to determine which state's substantive law applies to Plaintiffs' common law claims. (Def. Br. at 12-18.) Plaintiffs assert the following common law claims on behalf of the individually named Plaintiffs and the putative classes: Count 2: fraud; Count 3: fraudulent concealment; Count 4: breach of express warranty; Count 5: breach of implied warranty; Count 7: unjust enrichment; and Count 8: negligent misrepresentation. Plaintiffs assert that it would be premature to engage in a choice of law analysis at this early stage of the litigation. (Opp. at 8.) The Court agrees with Plaintiffs.

Pursuant to 28 U.S.C. § 1332(d)(2)(A) (the "Class Action Fairness Act of 2005" or "CAFA"), this Court has subject matter jurisdiction over Plaintiffs' claims. Plaintiffs brought this matter as a putative class action under Federal Rule of Civil Procedure 23, alleging that at least one proposed class member is of diverse citizenship from Defendant, the proposed nationwide

class includes more than 100 members, and the aggregate amount in controversy exceeds $5,000,000. (SAC ¶ 112); 28 U.S.C. § 1332(d)(2)(A). The parties do not contest personal jurisdiction or the amount in controversy. As explained above, the parties do, however, contest choice of law for the numerous common law claims in the Second Amended Complaint.

Federal courts exercising diversity jurisdiction must apply the choice-of-law principles of the forum state. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). New Jersey follows the "most significant relationship" test, a "case-by-case, qualitative analysis" consisting of two prongs. *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 293 (D.N.J. 2009) (citing *P.V. ex rel T.V. v. Camp Jaycee*, 962 A.2d 453, 460-61 (N.J. 2008)). The first prong requires a court to examine the substance of the potentially applicable laws to determine whether an actual conflict exists. *Camp Jaycee*, 962 A.2d at 460 (citing *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006)). If no conflict exists, the analysis ends, and the court applies the law of the forum state. *Camp Jaycee*, 962 A.2d at 461. If a conflict does exist, the court turns to the second prong, which requires the court to weigh the factors enumerated in the Restatement section corresponding to the underlying cause of action. *Id.*; *see also* RESTATEMENT (SECOND) CONFLICT OF LAWS § 6 (1971).

At this stage of the litigation, the Court declines to conduct a choice of law analysis because such analysis would be premature. "Applying the factors necessary to determine choice of law . . . is a very fact-intensive inquiry." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (citing *Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 491 (D.N.J. 2009) (postponing choice of law analysis "until the parties present a factual record full enough")). The choice of law analysis, therefore, has "routinely been found to be premature at the motion to dismiss phase of a class action lawsuit." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No.

16-2765, 2017 U.S. Dist. LEXIS 70299, at *33 (D.N.J. May 8, 2017); *Patlan v. BMW of N. Am., LLC*, No. 18-09546, 2024 U.S. Dist. LEXIS 56022, at *26 (D.N.J. Mar. 28, 2024); *Cilluffo v. Subaru of Am., Inc.*, No. 23-1897, 2024 U.S. Dist. LEXIS 53552, at *10-11 (D.N.J. Mar. 26, 2024); *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-6590, 2013 U.S. Dist. LEXIS 50788, at *17 (D.N.J. Apr. 9, 2013).

Because this Court finds a choice-of-law analysis to be inappropriate at this stage, it declines to rule on the common law claims. The Court will focus on the claims corresponding to the individually named Plaintiffs for purposes of resolving Defendant's motion to dismiss. The Court therefore limits its review to Plaintiffs' claims where choice of law is not in question. *See Cilluffo v. Subaru of Am., Inc.*, No. 23-1897, 2024 U.S. Dist. LEXIS 53552, at *11-12 (D.N.J. Mar. 26, 2024) (limiting review to plaintiffs' claims where choice of law was not in question). Therefore, at this juncture, Defendant's motion to dismiss the common law claims (Counts 2, 3, 4, 5, 7, and 8) is denied.

### C.   Magnuson-Moss Warranty Act (MMWA)

In Count 6, Plaintiffs allege a breach of written warranty under the Magnuson-Moss Warranty Act, MMWA, 15 U.S.C. § 2310 *et seq.* Defendant argues Count 6 must be dismissed because Plaintiffs fail to meet the jurisdictional requirements of the MMWA. (Def. Br. at 23.) The Court agrees. The Third Circuit has explained that for purposes of establishing subject matter jurisdiction, the MMWA requires that a claim identify 100 named plaintiffs. *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023).[3] Here, Plaintiffs' SAC falls short of identifying 100 named plaintiffs. Accordingly, Count 6 is dismissed without prejudice.

---

[3] While this Court has jurisdiction pursuant to the CAFA, the Third Circuit has explicitly held that the CAFA cannot be used to otherwise create subject matter jurisdiction for MMWA claims. *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023) ("CAFA does not provide a basis for federal jurisdiction over MMWA class actions that do not satisfy the MMWA's jurisdictional requirements.").

### D.       State Statutory Consumer Protection Claims

Plaintiffs assert several state statutory claims on behalf of themselves and their respective state sub-classes. The Court addresses each claim in turn.

### 1.   New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. § 56:8-2, *et seq.*

In Count 1, Plaintiffs Reinkraut and Solimando, on behalf of themselves and the New Jersey subclass, allege violations of the NJCFA, N.J. Stat. Ann. § 56:8-2, *et seq.* Defendant argues Plaintiffs' claims must be dismissed because they fail to sufficiently plead actionable misrepresentations or omissions, and the claims are barred by the economic loss doctrine. (Def. Br. at 36-40, 42-23.) "To state a prima facie case under the NJCFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Lieberson v. Johnson & Johnson Consumer Cos., Inc.*, 865 F. Supp. 2d 529, 538 (D.N.J. 2011) (citing *Payan v. GreenPoint Mortg. Funding, Inc.*, 681 F. Supp. 2d 564, 572 (D.N.J. 2010)).[4] Neither Reinkraut nor Solimando identify actionable misrepresentations or omissions attributable to FCA. While both Plaintiffs allege they conducted online research prior to purchasing their vehicles (SAC ¶¶ 30, 103), and the SAC generally alleges that Defendant advertises the Class Vehicles as safe, dependable, and durable, (*see, e.g.*, *id.* ¶ 1), Plaintiffs fail to identify any statements or information attributable to FCA that rise to actionable

---

[4] "An actionable loss is not 'hypothetical or illusory.'" *Spera v. Samsung Elecs. Am., Inc.*, No. 12-05412, 2014 WL 1334256, at *5 (D.N.J. Apr. 2, 2014) (quoting *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792 (N.J. 2005)). Instead, "what New Jersey Courts require for that loss to be 'ascertainable' is for the consumer to quantify the difference in value between the promised product and the actual product received." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99 (D.N.J. 2011). "The mere fact that an automobile defect arises does not establish, in and of itself, an actual and ascertainable loss to the vehicle purchaser." *Cohen*, 2022 WL 721307, at *28 (quoting *Thiedemann*, 872 A.2d at 794 (N.J. 2005)).

misrepresentations or omissions constituting unlawful conduct under the NJCFA.[5] Accordingly Count 1 is dismissed without prejudice.

### 2. Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq.*

In Count 10, Plaintiff Chapman, on behalf of himself and the Florida subclass, alleges Defendant violated the FDUTPA. Defendant argues Chapman fails to state an FDUTPA claim because he fails to plead an affirmative misrepresentation or omission, and the economic loss doctrine bars his claims. (Def. Br. at 36-40, 44.)

"The three elements of a consumer claim under FDUTPA are: '(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016)). Courts use an objective test to determine whether an act is deceptive under FDUTPA, and "the plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Marrache*, 17 F.4th at 1098 (citing *Carriuolo*, 823 F.3d at 983-84 (quoting *State, Office of the Att'y Gen. v. Com. Com. Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007))). To establish an unfair practice, the plaintiff must show that it is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Marrache*, 17 F.4th at 1098 (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quoting *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 489 (Fla. Dist. Ct. App. 2001))). Under the FDUTPA, actual damages "are measured according to 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it

---

[5] Because both Plaintiffs fail to plead an NJCFA claim, the Court need not address the economic loss doctrine at this time.

should have been delivered according to the contract of the parties.'" *Carriuolo*, 823 F.3d at 986 (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)). A plaintiff, however, cannot state a cause of action under FDUTPA if the consumer fails to plead that they suffered actual damages. *Marrache*, 17 F.4th at 1098 (citing *Macias v. HBC of Florida, Inc.*, 694 So. 2d 88, 90 (Fla. Dist. Ct. App. 1997) (holding that plaintiff failed to state a cause of action under FDUTPA as she suffered no actual damages and affirming dismissal of complaint with prejudice)).[6] In the SAC, Chapman does not identify any unfair practice or deceptive act that caused him damages. He alleges that prior to purchase, he "conducted online research" regarding the vehicle that he ultimately purchased. (SAC ¶ 43.) While the SAC generally alleges that Defendant advertises the Class Vehicles as safe, dependable, and durable (*see, e.g.*, *id.* ¶ 1), Chapman alleges no facts identifying an unfair practice or deceptive act and instead makes conclusory allegations. Furthermore, he states that his insurance paid for the repairs. (*Id.* ¶ 47.) Accordingly, Count 10 is dismissed without prejudice.

### 3. Utah Consumer Sales Practices Act (UCSPA), Utah Code Ann. § 13-11-1 et seq.

In Count 16, Plaintiff Zaugg, on behalf of himself and the Utah subclass, alleges Defendant violated the UCSPA, Utah Code Ann. § 13-11-1 *et seq.* Defendant argues that Zaugg's claim must be dismissed because Zaugg failed to adequately allege an intent to deceive. (Def. Br. at 47-48.) The Court agrees with Defendant.

The UCSPA generally "prohibits deceptive or unconscionable acts or practices by a supplier in connection with a consumer transaction." *Carlie v. Morgan*, 922 P.2d 1, 5-6 (Utah

---

[6] "Indeed, '[t]he members of [a] putative class who experienced no actual loss have no claim for damages under FDUTPA.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *Rollins, Inc. v. But-land*, 951 So. 2d 860, 873 (Fla. Dist. Ct. App. 2006))).

1996) (internal quotation marks omitted). However, "the plain language of the UCSPA specifically identifies intentional or knowing behavior as an element of a deceptive act or practice." *Martinez v. Best Buy Co.*, 283 P.3d 521, 523 (Utah Ct. App. 2012). Allegations of intent under the UCSPA must be pleaded with particularity as required by Rule 9(b). *See Goodwin v. Hole No. 4*, 2006 WL 3327990, at *7 (D. Utah Nov. 15, 2006). While Zaugg includes a few conclusory allegations regarding Defendant's intent to deceive, such allegations fall short of satisfying Rule 9(b)'s requirements. "In order to satisfy Rule 9(b), a complaint must provide 'all of the essential factual background that would accompany the first paragraph of any newspaper story' — that is, the 'who, what, when, where and how' of the events at issue.'" *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). Accordingly, Count 16 is dismissed without prejudice.

### 4. Washington Consumer Protection Act (WCPA), Wash. Rev. Code Ann. § 19.86.010 *et seq.*

In Count 17, Plaintiff Willcutt, on behalf of himself and the Washington subclass, claims that Defendant violated the WCPA, Wash. Rev. Code § 19.86.010 *et seq.* The WCPA provides: "[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce are hereby declared unlawful." *Id.* § 19.86.020. An adequately pled WCPA claim contains five elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) impacting the public interest; (4) causing; (5) injury to business or property. *Ridge Training Stables v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986). A deceptive act must have the capacity to deceive or mislead the public. *See McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1097 (W.D. Wash. 2013).[7] Because the allegations in the SAC sound in fraud, the

---

[7] Whether the act was intended to deceive, and whether it actually succeeded in the deception, are not relevant considerations at this stage. *See Bloor v. Fritz*, 180 P.3d 805, 815-16 (Wash. App. Div. 2008) ("To show that a party

pleadings must satisfy the particularity requirement of Rule 9(b). Fed. R. Civ. P. 9(b); *Fidelity Mortg. Corp. v. Seattle Times Co.*, 213 F.R.D. 573, 575 (W.D. Wash. 2003). Accordingly, Willcutt must set forth with sufficient particularity the information he claims is false, when and where that information was provided to him, and how that information is false or misleading. *See id.* at 575. He fails to do so. Willcutt vaguely asserts that he "did online research" before purchasing his vehicle. (SAC ¶ 60.) He does not identify specific information promulgated by Defendant, and he does not explain how such information was false or misleading. While WCPA claims may also be premised on material omissions, *see Garza v. Nat'l R.R. Passenger Corp.*, 418 F. Supp. 3d 644, 655 (W.D. Wash. Oct. 1, 2019), Plaintiff fails to specifically plead that he encountered or was exposed to any material through which Defendant could have made a fraudulent omission. Accordingly, Count 17 is dismissed without prejudice.

### 5. Virginia's Consumer Protection Act (VCPA), Va. Code Ann. § 59.1-198, -200

In Count 18, Plaintiff Secco, on behalf of himself and the Virginia subclass, alleges Defendant violated the VCPA. To state a claim under the VCPA, a plaintiff must allege "(1) fraud, (2) by a supplier, (3) in a consumer transaction." *Nahigian v. Juno Loudoun*, 684 F. Supp. 2d 731, 741 (E.D. Va. 2010). To demonstrate fraud for a VCPA claim, a plaintiff must show "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Id.* at 738 (internal quotation marks omitted). Defendant argues that Secco's claim must be dismissed

---

has engaged in an unfair or deceptive act or practice, a plaintiff need not show that the act in question was intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public." (internal quotations omitted). The subject matter of the deceptive practice must be of "material importance" to the business at issue. *See McDonald*, 929 F. Supp. 2d at 1097.

because he fails to allege a false representation, FCA's knowledge, or his own reliance. (Def. Br. at 36-42, 49.)

Secco fails to identify any misrepresentations upon which he relied. The SAC vaguely states Secco "conducted online research" regarding the vehicle that he ultimately purchased. (SAC ¶ 68.) However, Secco neither identifies specific statements made or information promulgated by FCA, nor explains how any such statements or information were false or misleading. He fails to state a claim pursuant to the VCPA.[8] Accordingly, Count 18 is dismissed without prejudice.

### 6. Indiana Deceptive Consumer Sales Act (IDCSA), Ind. Code § 24-5-0.5-1 *et seq.*

In Count 19, Plaintiffs Linda and John Kotos, on behalf of themselves and the Indiana subclass, allege Defendant violated the IDCSA. Defendant argues that Plaintiffs fail to state an IDCSA claim because they fail to sufficiently plead actionable misrepresentations or omissions. (Def. Br. at 36-40.)

"The IDCSA 'provides remedies to consumers and the attorney general for practices that the General Assembly deemed deceptive in consumer transactions.'" *Davis v. Contactability.com, LLC*, No. 16-02999, 2017 U.S. Dist. LEXIS 12926, at *3-4 (S.D. Ind. Jan. 31, 2017) (quoting *McKinney v. State*, 693 N.E.2d 65, 67 (Ind. 1998)). The IDCSA provides for two kinds of actionable deceptive acts: "uncured" and "incurable" acts. *Davis*, 2017 U.S. Dist. LEXIS 12926, at *4 (citing *McKinney*, 693 N.E.2d at 68). To state a claim for an uncured deceptive act under the IDCSA, a plaintiff must provide "not only a complete description of the actual damage suffered, but also a description of the alleged deceptive act . . . so that the supplier has an opportunity to correct the problem." *Davis*, 2017 U.S. Dist. LEXIS 12926, at *4 (quoting *A.B.C. Home & Real*

---

[8] Because the Court finds Secco did not plead a false representation, it need not address the elements of knowledge or reliance at this juncture.

*Estate Inspection, Inc. v. Plummer*, 500 N.E.2d 1257, 1262 (Ind. Ct. App. 1986)). An incurable act is done "as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8). "Intent to defraud or mislead is thus clearly an element of an incurable deceptive act." *McKinney*, 693 N.E.2d at 68. In the SAC, neither Linda nor John Kotos identify actionable deceptive acts promulgated by FCA. Accordingly, Count 19 is dismissed without prejudice.

### 7. Texas Deceptive Trade Practices Act (TDTPA), Tex. Bus. & Comm Code §§ 17.41 *et seq.*

In Count 20, Plaintiff Wilson, on behalf of himself and the Texas subclass, claims Defendant violated the TDTPA. Defendant argues Wilson fails to state a claim because, among other things, he does not establish an affirmative misrepresentation. (*See generally* Def. Br. at 36-42.) "To state a TDTPA claim, a plaintiff must allege that: (1) he is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a producing cause of the consumer's damages." *Diez v. Google, Inc.*, 831 F. App'x 723, 724 (5th Cir. 2020). "[C]ourts have consistently applied [Federal Rule of Civil Procedure] 9(b)'s heightened pleading standard to . . . Texas Deceptive Trade Practices Act ('DTPA') claims." *Gonzalez v. State Farm Lloyds*, 326 F. Supp. 3d 346, 350 (S.D. Tex. 2017). Wilson does not sufficiently identify or detail any false, misleading, or deceptive acts by FCA. While he asserts that prior to purchase, he researched the vehicle he ultimately purchased on the Jeep sales site (SAC ¶ 86), and the SAC generally alleges that Defendant advertises the Class Vehicles as safe, dependable, and durable, (*see, e.g.*, *id.* ¶ 1), Plaintiff does not plead specific facts about a deceptive act by FCA. Accordingly Count 20 is dismissed without prejudice.

### 8. Maryland Consumer Protection Act (MCPA), Md. Code Ann., Com. Law § 13-101 *et seq.*

In Count 21, Plaintiff Morris, on behalf of himself and the Maryland subclass, claims violations of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-301, *et seq*. To state a claim under the MCPA, a plaintiff must allege (1) an unfair or deceptive practice or misrepresentation that is (2) relied upon and (3) causes him actual injury. *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 319 (D. Md. Feb. 20, 2014) (citing *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007)). Plaintiff Morris fails to allege facts that establish an unfair or deceptive practice or misrepresentation in connection with his MCPA claim. He alleges that a small pebble struck his windshield, leaving a chip the size of a pencil eraser. (SAC ¶ 94.) He alleges that the chip evolved into cracks that spread across the entire windshield. (*Id.*) Morris took the vehicle to the dealer, and the dealer refused to make the repair because a pebble caused the point of impact. (*Id.*) Morris argued that the expansive cracks, which spread across the entire windshield, seemed consistent with the experiences of other Jeep owners. (*Id.*) The dealer stated it was only aware of Jeep Compacts having windshield problems. (*Id.*) The dealer explained that "corporate" had not provided any directives for handling windshield complaints. (*Id.*) These particular facts and the conclusory allegations otherwise stated in the SAC do not establish an unfair or deceptive practice or misrepresentation. Morris fails to state a MCPA claim, and Count 21 is dismissed without prejudice.

### 9.  California Claims

Plaintiff Medina alleges that Defendant violated the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 *et seq*. (Count 11), Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.* (Count 12), and the False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500 *et seq.* (Count 13). Under the FAL, the CLRA, and the fraudulent prong of the UCL, conduct is considered deceptive or misleading if the conduct is "likely to deceive" a "reasonable

29

consumer." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Because the same standard for fraudulent activity governs all three statutes, courts often analyze the three statutes together. *See, e.g.*, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F.Supp.2d 942, 985 (S.D. Cal. 2014); *In re Plum Baby Food Litig.*, No. 21-00913, 2024 U.S. Dist. LEXIS 56920, at *14-15 (N.D. Cal. Mar. 28, 2024). Plaintiff Medina has failed to plead with specificity deceptive or misleading conduct. She alleges she "did online research regarding" the Class Vehicle before she purchased it (SAC ¶ 49), but she does not identify any fraudulent conduct by Defendant. While the SAC generally alleges that Defendant advertises the Class Vehicles as safe, dependable, and durable, (*see, e.g.*, *id.* ¶ 1), Plaintiff Medina does not specifically identify any fraudulent conduct by FCA. Accordingly, Counts 11, 12, and 13 are dismissed without prejudice.

### E. Song-Beverly Claims

Under the Song-Beverly Act, "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation . . . under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." Cal. Civ. Code § 1794(a). Defendant moves to dismiss Plaintiff Medina's express and implied warranty claims asserted under the Song-Beverly Act.

### i. Express Warranty Claim

In Count 14, Plaintiff Medina, on behalf of herself and the California subclass, asserts an express warranty claim pursuant to the Song-Beverly Act. The Song-Beverly Act is a remedial statute designed to protect consumers who have purchased products covered by an express warranty. *Ruvalcaba v. Hyundai Motor Am.*, 22-01244, 2024 U.S. Dist. LEXIS 41621, at *4 (C.D. Cal. Jan. 4, 2024). The Act regulates warranty terms and imposes repair and service obligations

on the parties issuing the warranties. *Id.* To state a breach of express warranty claim under the Song-Beverly Act, a plaintiff must meet the following elements: (1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of attempts to repair. *Gonzalez v. Ford Motor Co.*, No. 19-652, 2019 WL 1364976, at *5 (C.D. Cal. Mar. 22, 2019) (citing *Arteaga v. Carmax Auto Superstores W. Coast, Inc.*, No. 14-1888, 2014 WL 3505527, at *3 (C.D. Cal. July 11, 2014)).

The SAC states that FCA's Basic Limited Warranty lasts for 36 months from the date it begins or 36,000 miles on the odometer, whichever occurs first. (SAC ¶ 149.) FCA limits the warranty on the windshield for only 12 months or 12,000 miles, whichever occurs first. (*Id.*) The warranty states, "[y]our warranties do not cover conditions resulting from anything impacting the vehicle. This includes cracks and chips in glass, scratches and chips in painted surfaces, or damage from collision." (*Id.*) Plaintiff Medina purchased her vehicle in March 2021. (SAC ¶ 48.) On May 22, 2022, Medina saw her windshield was cracked. (*Id.* ¶ 51.) Therefore, the alleged Windshield Defect arose more than 12 months following the sale of her vehicle, which is outside the timeframe of the express warranty. However, Plaintiff Medina counters that the time limits on the express warranties are unconscionable. (*Id.* ¶ 299.)

A court may refuse to enforce contracts, or discrete contract clauses, that are unconscionable. *Aron v. U-Haul Co. of Cal.*, 49 Cal. Rptr. 3d 555, 564 (Cal. Ct. App. 2006). In auto defect cases, a plaintiff may avoid durational warranty limits of an automobile manufacturer's warranty if she properly alleges the warranty is unconscionable. *See Skeen v. BMW of N. Am., LLC*, No. 13-1531, 2014 WL 283628, at *12 (D.N.J. Jan. 24, 2014). To determine whether a

contract is unconscionable, a court evaluates both procedural and substantive unconscionability. Procedural unconscionability "focuses on two factors: oppression and surprise." *Aron*, 49 Cal. Rptr. 3d at 564. The substantive unconscionability element "focuses on the actual terms of the agreement and evaluates whether they create overly harsh or one-sided results as to shock the conscience." *Id.* (internal quotations omitted). Finally, courts generally apply "a sliding-scale: to determine overall unconscionability, "[i]n other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and *vice versa*." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Proc.*, 754 F. Supp. 2d 1145, 1181-82 (C.D. Cal. 2010) (quoting *Armendariz v. Foundation Health Psychcare Servs.*, 6 P.3d 669, 767-68 (Cal. 2000)). Here, Plaintiff has included some conclusory allegations regarding the unconscionability of the warranty's durational limits. However, she has not provided the full terms of the warranty itself, so the Court cannot adequately assess substantive unconscionability at this time. Accordingly, Count 14 is dismissed without prejudice.

### ii. Implied Warranty Claim

In Count 15, Plaintiff Medina asserts an implied warranty claim pursuant to the Song-Beverly Act. Under the Act, "every retail sale of 'consumer goods' in California includes an implied warranty by the manufacturer and the retail seller that the goods are 'merchantable' unless the goods are expressly sold 'as is' or 'with all faults.'" *Mexia v. Rinker Boat Co., Inc.*, 95 Cal. Rptr. 3d 285, 289 (Cal. Ct. App. 2009) (citing Cal. Civ. Code §§ 1791.3, 1792). This implied warranty is "coextensive in duration with an express warranty which accompanies the consumer goods . . . but in no event shall such implied warranty have a duration of . . . more than one year following the sale of new consumer goods to a retail buyer." Cal. Civ. Code § 1791.1(c). Plaintiff

Medina purchased her vehicle in March 2021. (SAC ¶ 48.) On May 22, 2022, Medina saw her windshield was cracked. (*Id.* ¶ 51.) Therefore, the alleged Windshield Defect arose more than one year following the sale of her vehicle, which is outside the timeframe for an implied warranty claim under the Song-Beverly Act. Plaintiff Medina argues that the one-year limit should not apply because the Windshield Defect was a latent defect. (Opp. at 31-32.) While the Ninth Circuit has reasoned that the one-year limit "does not create a deadline for discovering latent defects or for giving notice to the seller," *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1223 (9th Cir. 2015), the SAC does not sufficiently allege that the Windshield Defect was a latent defect. Accordingly, Count 15 is dismissed without prejudice.

## IV.     CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is **GRANTED in part** and **DENIED in part.** An appropriate order accompanies this opinion.


*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**


Orig:       Clerk
cc:         Cathy L. Waldor, U.S.M.J.