<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JACOB REINKRAUT, MATTHEW CHAPMAN, SARI MEDINA, JT WILLCUTT, ROBERT ZAUGG, ROBERT SECCO, JOHN and LAURA KOTOS, MAURICE WILSON, KEVIN MORRIS, and ANTHONY SOLIMANDO on behalf of themselves and the Putative Class, | Civil Action No. 23-02792 |
| *Plaintiffs*, | **OPINION** |
| v. | June 30, 2025 |
| FCA US LLC, a Delaware Limited Liability Company, | |
| *Defendant*. | |

**SEMPER**, District Judge.

**THIS MATTER** comes before the Court upon Defendant FCA US LLC's ("FCA") Motion to Dismiss (ECF 61, "Motion" or "Mot.") Plaintiffs Jacob Reinkraut, Matthew Chapman, JT Willcutt, Robert Zaugg, Robert Secco, John and Laura Kotos, Maurice Wilson, Kevin Morris, and Anthony Solimando's Third Amended Complaint (ECF 56, "TAC"). The Court has decided this Motion upon the parties' submissions, without oral argument, pursuant to Federal Rule of Civil Procedure 78 and Local Rule 78.1. For the reasons set forth below, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

1

**WHEREAS** this putative class action arises from an alleged Windshield Defect present in certain Jeep vehicles.  (TAC ¶¶ 1-2.)  Plaintiffs Jacob Reinkraut, Matthew Chapman, Sari Medina, JT Willcutt, Robert Zaugg, Robert Secco, John and Laura Kotos, Maurice Wilson, Kevin Morris, and Anthony Solimando ("Plaintiffs") bring this action on behalf of themselves and all similarly-situated individuals and entities (the "Class") who own, lease, or have owned or leased Jeep Wranglers and Gladiators for model years 2016 to the present (hereinafter, the "Class Vehicles") manufactured and/or sold by the Defendant, FCA US LLC (hereinafter "Defendant" or "FCA"). (*Id.* ¶ 1.); and

**WHEREAS** Defendant designs, manufactures, and warrants the Class Vehicles. (*Id.*) Defendant advertises the Class Vehicles as safe, dependable, and durable.  (*Id.*)  However, the Class Vehicles are allegedly designed and manufactured with one or more manufacturing and design defects that make the Class Vehicles' windshields "extremely prone to cracking, fracturing, or chipping."  (*Id.* ¶ 2.)  The Windshield Defect allegedly causes "the front windshield to crack, fracture or chip for no reason, or under circumstances that would not cause a normal, non-defective windshield to become impaired and fail, such as during use of the defroster or having a small pebble from the road bounce up onto the windshield."  (*Id.* ¶ 3.)  Plaintiffs allege the Windshield Defect presents an unreasonable safety hazard due to its impact on driver visibility, Class Vehicles' structural integrity, and driver and passenger safety.  (*Id.* ¶ 4.); and

**WHEREAS** Plaintiffs initiated this action on May 23, 2023 by filing the initial Complaint. (ECF 1.)  Plaintiffs amended their initial Complaint once as of right (ECF 9, First Amended Complaint "FAC"); a second time pursuant to this Court's order (ECF 26, Second Amended Complaint "SAC" at ECF 27); and a third time, also pursuant to this Court's order, after this Court

2

granted in part and denied in part FCA's Motion to Dismiss the SAC (TAC at ECF 56; Opinion and Order on Motion to Dismiss the SAC at ECF 53 and 54.)    After Plaintiffs filed the TAC, Defendant moved to dismiss (ECF 61), Plaintiffs opposed the Motion (ECF 64, "Opposition" or "Opp."), and Defendant filed a Reply (ECF 65).  The TAC contains a new subclass containing persons or entities who own, lease or have owned or leased a Jeep Wrangler, Gladiator, or Grand Cherokee containing Gorilla Glass, which Plaintiffs allege is a "purportedly stronger and more break resistant glass" that nevertheless contains the Windshield Defect. (TAC ¶¶ 7-8.) Plaintiffs' Third Amended Complaint asserts twenty counts, as follows:

- Six common law claims: Count 2: fraud; Count 3: fraudulent concealment; Count 4: breach of express warranty; Count 5: breach of implied warranty; Count 7: unjust enrichment; and Count 8: negligent misrepresentation;

- Two statutory express warranty claims: Count 6: breach of written warranty under the Magnuson-Moss Warranty Act and Count 13: breach of express warranty under California's Song-Berly Act;

- One statutory implied warranty claim: Count 14: breach of implied warranty under California's Song-Berly Act; and

- Thirteen statutory consumer protection claims: Count 1: violation of New Jersey's Consumer Fraud Act; Count 9: violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"); Count 10: violation of the California Consumers Legal Remedies Act; Count 11: violation of the California Unfair Competition Law; Count 12: violation of California's False Advertising Law; Count 15: violation of the Utah Consumer Sales Practices Act ("UCSPA"); Count 16: violation of the Washington

Consumer Protection Act ("WCPA"); Count 17: violation of Virginia's Consumer Protection Act ("VCPA"); Count 18: violation of the Indiana Deceptive Consumer Sales Act ("IDCSA"); Count 19: violation of the Texas Deceptive Trade Practices Act ("TDTPA"); and Count 20: violation of the Maryland Consumer Protection Act ("MCPA").[1]

(*See generally* TAC ¶¶ 144-394.); and

**WHEREAS** on or about June 6, 2022, Plaintiff Reinkraut, a New Jersey citizen, purchased a pre-owned 2016 four-door, Jeep Wrangler Rubicon, with 33,548 miles, VIN number 1C4BJWFG9GL274352 online from Lenz Auto for $40,492. (*Id.* ¶ 30.) Lenz Auto drove the vehicle from Wisconsin and delivered it to Reinkraut in New Jersey. (*Id.*) Lenz Auto then took Reinkraut's 2009 Jeep from his home in New Jersey and paid him a trade-in value of $11,000. (*Id.*) Prior to purchase, from his home in New Jersey, Reinkraut alleges that he conducted online research on the 2016 four-door, Jeep Wrangler Rubicon on the Jeep website. (*Id.* ¶ 31.) The Jeep website included photos and videos of individuals driving Jeeps, including Reinkraut's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) Reinkraut reviewed and e-signed the purchase documents from his home in New Jersey and electronically sent them back from New Jersey to Lenz Auto. (*Id.*) Reinkraut's vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant FCA. (*Id.* ¶ 32.) On January 3, 2023, while Reinkraut drove his vehicle in New Jersey, he noticed the windshield was cracked.

---

[1] On June 11, 2024, Plaintiffs Steve Smith, Joseph Magee, and James Murray voluntarily dismissed their claims against Defendant pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (ECF 47; ECF 48; ECF 49.) Accordingly, the Court will not address the North Carolina claim asserted by Smith (Count 9), the Pennsylvania claim asserted by Murray (Count 22), or the Florida claim as asserted by Magee (Count 10).

(*Id.* ¶ 33.)  He alleges that he had not seen anything impact the windshield.  (*Id.*)  He alleges that he was surprised the windshield cracked because he knew that the vehicle had come equipped with Gorilla Glass.  (*Id.*)  Mopar, Chrysler's parts and accessories division, offers a Gorilla Glass windshield kit for the Jeep Wrangler.  (*Id.*)  Jeep touts the benefits of Gorilla Glass in its brochures.  (*Id.*; *see also* ECF 56-3.)  Reinkraut's insurance agent in New Jersey recommended that he contact Quest Auto Glass to replace the windshield.  (TAC ¶ 35.)  Reinkraut paid $625 for a replacement windshield in New Jersey.  (*Id.* ¶ 36.); and

**WHEREAS** on January 15, 2022, Plaintiff Chapman, a Florida citizen, purchased a new 2021 Jeep Gladiator Overland 4x4, VIN number 1C6HJTFG9ML621450, for $55,300.00 from Jim Browne Chrysler Jeep Dodge Ram in Tampa, Florida.  (*Id.* ¶ 37.)  Plaintiff Chapman alleges that the vehicle had 10 miles on it at the time of purchase, currently has 13,356 miles, and is still under warranty.  (*Id.*)  Prior to purchase, Chapman allegedly conducted online research regarding the vehicle that he ultimately purchased.  (*Id.* ¶ 38.)  The Jeep website included photos and videos of individuals driving Jeeps, including Chapman's model, over rough terrain, up mountains, on rocky roads, and in the desert.  (*Id.*)  Chapman's vehicle was designed, manufactured, distributed, advertised, marketed, and warranted by Defendant.  (*Id.* ¶ 39.)  Chapman's vehicle was sold with Corning Gorilla Glass, listed on the Monroney sticker at an extra cost of $195.  (*Id.* ¶ 40.)  Chapman reviewed the Monroney sticker prior to purchase.  (*Id.*; *see also* ECF 56-4.)  Jeep touts the benefits of Gorilla Glass in its brochures.  (TAC ¶ 41.)  On or about December 22, 2022, Chapman allegedly observed that his windshield was cracked in two places.  (*Id.* ¶ 42.)  He alleges there was no cause for  the cracks "as nothing hit the windshield and there were no marks indicating that a rock or pebble had hit the windshield."  (*Id.*)  Initially, Chapman allegedly tried to have the

5

windshield replaced at a Jeep dealership; however, he was allegedly advised that the dealership he called did not deal with glass. (*Id.* ¶ 43.) Consequently, on December 22, 2022, he allegedly called Safelite Auto Glass. (*Id.*) Safelite came to his home and replaced the windshield. (*Id.*) His insurance company covered the cost of the repair. (*Id.*) Chapman paid extra for the vehicle because it had Gorilla Glass. (*Id.*); and

**WHEREAS** in March 2021, Plaintiff Medina, a California citizen, leased a new 2021 Jeep Wrangler, VIN number 1C4HJXEM0MW565825, from Glendale Jeep Ram Dodge in Glendale, California. (*Id.* ¶ 44.) At the time of filing the Second Amended Complaint, the vehicle allegedly had approximately 35,000 miles and was still under warranty. (*Id.*) Prior to purchase, Medina alleges that she conducted online research regarding the vehicle she ultimately purchased. (*Id.* ¶ 45.) The Jeep website included photos and videos of individuals driving Jeeps, including Medina's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) Medina's vehicle was designed, manufactured, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 46.) On May 22, 2022, Medina allegedly woke up and saw her windshield was cracked. (*Id.* ¶ 47.) "There was no cause for this as nothing hit the windshield and there were no marks indicating that a rock or pebble had hit the windshield." (*Id.*) Medina allegedly inquired about having the windshield repaired by the dealership. (*Id.* ¶ 48.) She knew that the vehicle came with a three-year, 36,000-mile warranty but she alleges that she did not know when she first signed the lease that the windshield was excluded. (*Id.*) She was allegedly informed that the windshield repair was not covered, and she paid $465.00 out of pocket for a new windshield. (*Id.*) Section 2.1.B "What's Covered" of the Basic Limited Warranty on Medina's vehicle states: "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it

left the manufacturing plant that is defective in material, workmanship or factory preparation. . . . These warranty repairs or adjustments including all parts and labor connected with them, will be made by an authorized dealer at no charge, using new or remanufactured parts." (ECF 30-2.) On the next page at Section F, "When it Ends," Jeep states: "The Basic Limited Warranty lasts for three years from the date it begins or 36,000 miles on the odometer, whichever occurs first. The following items are covered for only one year or for 12,000 miles on the odometer, whichever occurs first: . . . Windshield and Rear Window. . . ." (*Id.*) Several pages later at Section 3.2, "Environmental Factors Not Covered," Jeep states, in pertinent part, "Your warranties do not cover conditions resulting from anything impacting the vehicle. This includes cracks and chips in glass, scratches and chips in painted surfaces, or damage from collision." (*Id.*); and

**WHEREAS** on August 31, 2021, Plaintiff Willcutt, a Washington state citizen, purchased a new 2021 Jeep Gladiator Overland 4x4, VIN number 1C6HJTFG6ML568903, for $55,270.00 (with taxes and fees, $60,100.21) from Olympia Chrysler Jeep, in Olympia Washington. (TAC ¶ 50.) When the Second Amended Complaint was filed, the vehicle allegedly had 18,614 miles and was still under warranty. (*Id.*) Prior to purchase, Willcutt allegedly conducted online research regarding the vehicle that he ultimately purchased. (*Id.* ¶ 51.) The Jeep website included photos and videos of individuals driving Jeeps, including Medina's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) The booklet for the 2021 Jeep Gladiator touts the strength of the vehicle, stated: "Born as a purpose- built 4x4 for the front lines in 1941, Jeep® 4x4s soon transitioned from the battlefields to the farm fields and backroads, where they kept up with hard daily use in industry and recreation alike. Through 80 years and all manner of terrain and weather, a growing lineup of Jeep® 4x4s has consistently moved the bar with strong

drivetrains, innovative engineering and quality components that stand out from all other 4x4 SUVs." (*Id*.; see also ECF 56-2.) Willcut's vehicle was designed, manufactured, distributed, advertised, marketed, and warranted by Defendant. (TAC ¶ 52.) Within a week of bringing the vehicle home, he noticed the windshield had cracked. (*Id*. ¶ 53.) "He alleges that "[t]here was no cause for this as nothing hit the windshield and there were no marks indicating that a rock or pebble had hit the windshield." (*Id*.) He alleges that he did not learn the terms of the warranty until after he purchased the vehicle. (*Id*.) The paperwork when he purchased a car allegedly had a QR Code that had to be scanned to access the written terms of the warranty. (*Id*.) He alleges that he has been driving the vehicle with a crack in the windshield ever since. (*Id*.); and

**WHEREAS** on July 30, 2021, Plaintiff Zaugg, a Utah citizen, purchased a 2021 Jeep Wrangler 4xe High Altitude, VIN 1C4JJXP65MW716691, for $64,425 from Salt Lake Valley Jeep. (*Id.* ¶ 54.) When the Second Amended Complaint was filed, the mileage was 28,000. (*Id.*) Prior to purchase, Zaugg alleges that he reviewed ads for the Wrangler 4xe on the dealer's website that were created by FCA. (*Id.* ¶ 55.) The Jeep website included photos and videos of individuals driving Jeeps, including Zaugg's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) In late November 2021, when his vehicle had 6,000 miles on it, Zaugg allegedly warmed up the Jeep in his driveway so that he could drive his children to school. (*Id.* ¶ 56.) He allegedly noticed a crack form at the bottom middle section of the windshield and rapidly spread to the right side of the windshield. (*Id.*) At the time of the initial cracking, Zaugg's vehicle was allegedly parked, there were no signs of impact from a rock, there was no "chip anywhere along the cracking[,]" and the windshield was clear of ice and snow. (*Id.*) Zaugg alleges that each time he used the front defroster during cold weather, cracking progressed. (*Id.*) Zaugg allegedly stopped

8

using the defroster while warming the vehicle. (*Id.*) Zaugg asserts that he brought the vehicle back to Salt Lake Valley Jeep. (*Id.* ¶ 57.) He was told that since he did not buy windshield protection at the time of purchase, he was out of luck in terms of repairs. (*Id.*) Zaugg has since taken the vehicle to another dealership for servicing. (*Id.*) An employee from this dealership allegedly told Zaugg that he had seen a lot of the "newer model" Wranglers in for repairs for windshields with cracking in the exact same spot. (*Id.*) Zaugg saw on internet forums that many other Jeep owners have had the same experience. (*Id.*) Initially, Zaugg did not replace his windshield "because he did not want to incur the additional cost when the windshield will just crack again due to defects in Jeep's manufacturing process." (*Id.* ¶ 58.) However, in October 2023 he paid $750 for a replacement windshield because the crack continued to spread and was interfering with his ability to see out the windshield while driving. (*Id.*); and

**WHEREAS** on or about June 12, 2020, Plaintiff Secco, an Italian citizen and Virginia resident, purchased a 2020 Jeep Wrangler, VIN C4HJXDN4LW223206, for approximately $48,000 prior to trade-in value, through a Retail Installment Sales Contract with Hall Chrysler Jeep Dodge in Virginia Beach, Virginia. (*Id.* ¶ 59.) Prior to purchase, Secco allegedly conducted online research regarding the vehicle that he ultimately purchased. (*Id.* ¶ 60.) The Jeep website included photos and videos of individuals driving Jeeps, including Secco's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) Additionally, when he was shopping for the vehicle he ultimately purchased, he saw that the vehicle came with the Monroney sticker listing all the features of the vehicle. (*Id.*) Secco reviewed the Monroney sticker prior to purchase. (*Id.*) Although it indicated that the vehicle had a three-year or 36,000 mile basic limited warranty, it did not indicate that the windshield was excluded from that warranty. (*Id.*) Secco's vehicle was

9

designed, manufactured, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 62.) Since purchasing the vehicle, Secco has allegedly experienced four broken windshields. (*Id.* ¶ 63.) In January 2023, a small pebble allegedly bounced off Secco's vehicle's windshield, causing a small crack. (*Id.* ¶ 64.) Safelite allegedly filled the crack with resin, but it did not charge Secco for the service. (*Id.*) On August 9, 2023, another small pebble allegedly bounced off the windshield, but this time the windshield cracked from top to bottom. (*Id.* ¶ 65.) Secco filed a claim with his insurance company, and he was authorized to replace the glass via Safelite. (*Id.*) The total price to repair with resin was $754.38, but Secco only paid the $50 deductible, and his insurance company paid the rest. (*Id.*) Two weeks, later, on August 21, 2023, while he was driving, he allegedly saw a crack that traveled from the top of the windshield to the bottom. (*Id.* ¶ 66.) He took the vehicle to Low Price Auto Glass in Virginia Beach, and the windshield was replaced at a cost of $490. (*Id.*) Four days later, the windshield allegedly cracked for a fourth time. (*Id.* ¶ 67.) As of the SAC's filing, Secco's Jeep had less than 25,000 miles. (*Id.* ¶ 68.) Secco waited until he needed to take the car for inspection before incurring the cost of another windshield replacement. (*Id.* ¶ 70.); and

**WHEREAS** on March 4, 2016, Plaintiff Laura Kotos, an Indiana citizen, purchased a new 2016 Jeep Wrangler, VIN 1CAJWAG6GL136366, for $30,841.00 (prior to aftermarkets and preferred maintenance only) from Thomas Dodge Chrysler Jeep of Highland Inc. in Highland, Indiana. (*Id*. ¶ 71.) Since purchasing the vehicle, the windshield has allegedly been replaced four times. (*Id*.) Most recently, the windshield allegedly cracked when a small object hit the windshield while driving. (*Id*.) The windshield was replaced by Lowell Auto Glass, in Lowell, Indiana, for $300.00. (*Id*.) The vehicle is now owned by John Kotos, Laura's husband. (*Id*.) He alleges that

he recently experienced another crack of the windshield caused by an object striking the windshield. (*Id*.) On June 29, 2023, Laura Kotos purchased a new 2023 Jeep Wrangler Sahara, VIN 1C4HJXEJG3PW655503, at a purchase price of $56,010.00 from Bozak Motors in Merrillville, Indiana. (*Id*. ¶ 72.) John and Laura Kotos allege that they researched the vehicle prior to purchase. (*Id*. ¶ 73.) Additionally, the Monroney sticker for Laura Kotos' vehicle that they reviewed prior to purchase indicated that it came with "Tinted Windshield Glass." (*Id*.) The Monroney sticker also included language that the vehicle came with a three-year or 36,000-mile Basic Limited Warranty, but it did not indicate that the windshield was excluded from that warranty. (*Id*.; see also ECF 56-7.) Their vehicles were designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant. (TAC ¶ 74.) Two weeks after purchase, while Laura Kotos drove on the expressway, the 2023 Wrangler's windshield allegedly cracked. (*Id*. ¶ 75.) She alleges that the crack progressively worsened as she drove home. (*Id*.) Kotos called the dealership requesting repair. (*Id*.) Kotos also called her insurance company. (*Id*.) The vehicle remained parked in the driveway until repair. (*Id*.) On approximately August 25, 2023, the windshield was replaced with remittance of a $500 deductible under her insurance policy. (*Id*.) Since then, the windshield allegedly cracked again, for no apparent reason. (*Id*.) Laura Kotos had driven to work and parked her vehicle in the Ford Motor Company employee parking lot. (*Id*.) Upon arrival, her windshield was intact. (*Id*.) When her shift ended and she returned to the lot, she discovered the windshield was cracked. (*Id*.) The windshield remains cracked. (*Id*.); and

**WHEREAS** on April 22, 2023, Maurice Wilson, a Texas citizen, purchased a 2023 Jeep Gladiator Texas Trail edition, VIN1C6HJTAG0PL530983, from Classic Chrysler Dodge Jeep Ram Fiat, in Arlington, Texas. (*Id.* ¶ 76.) The purchase price before rebates, trade-in, and

discounts was $49,170.00 and $39,585.06 after these reductions were taken. (*Id.*) The vehicle mileage as of the SAC's filing was 8,100 miles. (*Id.* ¶ 77.) When Wilson purchased the vehicle, the dealership allegedly needed to replace the windshield before it could be delivered. (*Id.* ¶ 78.) The replacement glass allegedly arrived broken, so Wilson had to wait over a week before he could take possession of the vehicle. (*Id.*) Prior to purchase, Wilson allegedly researched the vehicle he ultimately purchased on the Jeep sales site. (*Id.* ¶ 79.) The Jeep website included photos and videos of individuals driving Jeeps, including Wilson's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) Wilson's vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 80.) On July 14, 2023, while traveling through New Mexico, the windshield was allegedly struck by something in the upper-left corner, significantly damaging the glass. (*Id.* ¶ 81.) Wilson took his vehicle to the dealer to inquire whether the Jeep warranty would cover replacement, but due to impact damage, it was not covered. (*Id.*) The cost was not high enough to use his insurance, so Wilson paid out of pocket. (*Id.*) On July 24, 2023, Wilson had OEM glass installed at Safelite Auto Glass for $532.99. (*Id.*) On August 9, 2023, while sitting in his driveway preparing to back out, Wilson allegedly heard a "crack" and saw a large crack running from the base of the glass up and across the new windshield. (*Id.* ¶ 82.) He took the vehicle back to Safelite. (*Id.*) They told Wilson the crack resulted from impact. (*Id.*) However, Wilson alleges the crack was not caused by impact since the crack occurred while he was stationary in his driveway. (*Id.*) After several calls and a meeting with a Safelite trainer, the trainer informed Wilson that he too had issues with the glass in his Jeep. (*Id.*) "He informed Wilson that Jeeps were coming off the transport trucks with broken windshields, and that they see several Jeeps a day for just this problem." (*Id.*) The trainer informed Wilson

that he eventually went to aftermarket replacement glass, and his vehicle has since been fine. (*Id.*) On August 18, 2023, Wilson paid $175.76 for an aftermarket glass replacement. (*Id.*) Between April 22, 2023 and September 2023, Wilson had his windshield replaced three times. (*Id.* ¶ 83.); and

**WHEREAS** on May 12, 2023, Plaintiff Morris, a Maryland citizen, purchased a new 2023 Jeep Grand Cherokee from Darcars Jeep Chrysler, VIN 1C4RJJBG3P8835994, in Waldorf, Maryland, financing a total of $57,342.20. (*Id.* ¶ 84.) The vehicle came with a rain sensing windshield. (*Id.*) Prior to purchase, Morris alleges that he did online research regarding the vehicle he ultimately purchased on the Jeep sales site. (*Id.* ¶ 85.) The Jeep website included photos and videos of individuals driving Jeeps, including Morris's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) Morris's vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by Defendant. (*Id.* ¶ 86.) On June 14, 2023, a small pebble allegedly struck the windshield, leaving a chip the size of a pencil eraser. (*Id.* ¶ 87.) Within five days, while the vehicle was stored in a garage, the windshield allegedly cracked completely across with two distinct veins. (*Id*.) Morris took the vehicle to the dealer, who refused to make the repair because a pebble caused the point of impact. (*Id.*) Morris allegedly argued that the expansive cracks, which spread across the entire windshield, seemed consistent with the experiences of other Jeep owners. (*Id.*) The dealer stated it was only aware of Jeep Compacts having windshield problems. (*Id.*) The dealer explained that "corporate" had not provided any directives for handling windshield complaints. (*Id.*) Consequently, Morris filed a claim with his insurer, Geico, and paid a $50 deductible for the repairs. (*Id.* ¶ 88.); and

**WHEREAS** in May 2021, Plaintiff Solimando, a New Jersey citizen, purchased a pre-

13

owned 2020 Jeep Wrangler Sahara, VIN 1C4HJXENOLW147837, from Route 130 Chrysler Dodge Jeep Ram in Robbinsville, New Jersey for $35,000. (*Id.* ¶ 90.) At the time of purchase, the vehicle had 12,000 miles. (*Id.*) Prior to purchase, Solimando allegedly did online research regarding the vehicle he purchased on the Jeep sales site. (*Id.* ¶ 91.) The Jeep website included photos and videos of individuals driving Jeeps, including Solimando's model, over rough terrain, up mountains, on rocky roads, and in the desert. (*Id.*) Solimando's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranty by Defendant. (*Id.* ¶ 92.) Shortly after purchasing his vehicle, Solimando allegedly noticed the windshield was "unusually prone to small pebbles hitting the windshield leading to small chips." (*Id.* ¶ 93.) Solimando allegedly purchased a windshield repair kit at his own expense. (*Id.* ¶ 194.) He made repairs to the windshield himself because the dealer will not replace the windshield. (*Id.*); and

**WHEREAS** Plaintiffs allege Defendant knew of the Windshield Defect and the dangers associated with it. (*Id.* ¶ 121.) Plaintiffs assert that Defendant has acknowledged the importance of the windshield in its vehicles in its collision repair newsletter stating:

> The role of the windshield is a lot more complex than simply allowing a view of the road ahead. It is considered a structural part of the vehicle as it contributes to the strength of the roof and A- pillars. The windshield helps to manage collision energy and has become an integral part of several advanced safety systems. (*Id.* ¶ 114 (citing https://rts.i-car.com/collision-repair-news/crn-438.html).)

Plaintiffs state that accordingly, Defendant knew the Windshield Defect adversely impacted the safety and integrity of the Class Vehicles. (*Id.* ¶ 115.) Plaintiffs allege Defendant failed to inform Class Vehicle owners and lessees prior to purchase that the windshields of Jeep Wranglers, Gladiators, and Grand Cherokees were subject to premature cracking, fracturing, or chipping, would fail shortly after expiration of the express warranty, or would be denied warranty coverage

14

based upon exclusions in the warranty. (*Id.* ¶ 122.)  They also allege that Defendant failed to inform Class Vehicle owners and lessees at the time of purchase that the windshield in their Class Vehicles had been inadequately designed, manufactured, and tested prior to placing the car in production and the time of sale. (*Id.* ¶ 123.)  Plaintiffs generally state that Defendant misrepresented by affirmative conduct and/or omission and/or fraudulent concealment that the Windshield Defect existed. (*Id.* ¶ 122.)  Plaintiffs assert "[t]here is substantial evidence from numerous sources that FCA was aware that there were problems with Jeep Wrangler, Gladiator and Grand Cherokee windshields prior to Plaintiffs purchasing their Class Vehicles." (*Id.* ¶ 124.)  First, Plaintiffs allege that because Defendant's parts supplier, Mopar, offered Mopar windshields made with Corning Gorilla Glass for Jeep Wranglers and Gladiators starting with model year 2007, Defendant was "aware of the problem." (*Id.* ¶ 125.)  Second, Plaintiffs assert that "Defendant also knew, or reasonably should have known, of the Defect based upon the number of complaints it received from its dealerships and service shops." (*Id.* ¶ 126.)  Through dealers' record-keeping and computer systems that Defendant has access to, "Defendant has the ability to and does interact with Jeep dealers on a regular basis so as to be fully informed and troubleshoot problems as soon as they arise.  The common, serious windshield breakage problem in Jeep vehicles is one such problem." (*Id.*)  Third, Plaintiffs allege that Defendant's "customer relations division regularly receives and responds to customer calls, emails, and other correspondence concerning, *inter alia*, product defects. Through these sources, FCA was made aware, or reasonably should have been made aware, of the Windshield Defect, which is a problem that has persisted for years." (*Id.* ¶ 128.)  Fourth, Plaintiffs assert that numerous complaints posted on the National Highway Traffic Safety Administration database, which Defendant had an obligation to monitor, demonstrate

Defendant was aware of the Windshield Defect. (*Id.* ¶¶ 129-31.); and

**WHEREAS** under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss for lack of standing "because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). A motion to dismiss for lack of subject matter jurisdiction may either "attack the complaint on its face . . . [or] attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). "The former challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.'" *Id.* (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). "[A] factual challenge[] attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.'" *Davis*, 824 F.3d at 346 (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)). Motions to dismiss for lack of standing are best understood as facial attacks. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) ("Defendants' Rule 12(b)(1) motions are properly understood as facial attacks because they contend that the [a]mended [c]omplaints lack sufficient factual allegations to establish standing."). In assessing a facial attack on subject matter jurisdiction under Rule 12(b)(1), courts must apply the familiar 12(b)(6) standard. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d

16

235, 243 (3d Cir. 2012) ("In evaluating whether a complaint adequately pleads the elements of standing, courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim[.]"); and

**WHEREAS** Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted[.]" For a complaint to survive dismissal under the Rule, it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789. In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Restatements of a claim's elements are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210. Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015); and

17

**WHEREAS** "[w]hen a complaint involves allegations of fraud, a plaintiff must meet the heightened pleading requirements of Rule 9(b) to state a claim under Rule 12(b)(6)." *Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F. Supp. 3d 63, 68 (D.N.J. 2021) (citing *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014)); *see also* Fed. R. Civ. P. 9(b) (stating that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud," though conditions of the mind such as knowledge may be pled generally). "In order to satisfy Rule 9(b), a complaint must provide 'all of the essential factual background that would accompany the first paragraph of any newspaper story' — that is, the 'who, what, when, where and how' of the events at issue.'" *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). This standard has been relaxed slightly for fraudulent omission claims where pleading specific times and places may not be practicable and, instead, Rule 9(b) may be satisfied by "alleg[ing] what the omissions were, the person responsible for failing to disclose the information, the context of the omission and the manner in which it misled plaintiff and what defendant obtained through the fraud." *See Johansson v. Cent. Garden & Pet Co.*, 804 F. Supp. 2d 257, 264 (D.N.J. 2011) (quoting *Luppino v. Mercedes-Benz USA, LLC*, No. 09-5582, 2010 WL 3258259, at *7 (D.N.J. Aug. 16, 2010)); and

**WHEREAS** the Court reiterates—and Plaintiffs concede—that Plaintiffs lack standing to assert claims on behalf of a nationwide class. (Mot. at 9; Opp. at 4; Reply at 2.) "Therefore, Plaintiffs are limited to asserting claims on behalf of individuals in states where at least one named Plaintiff has standing for a claim." (ECF 53 at 18.) Similarly, the Court reiterates that Plaintiffs do have standing to bring claims on behalf of purchasers of all Class Vehicles. (*Id*. at 19.) Accordingly, the Motion is hereby **GRANTED** insofar as it seeks to bar Plaintiffs from asserting

claims on behalf of a nationwide class, and **DENIED** insofar as it seeks to bar Plaintiffs from asserting claims on behalf of purchasers of the Class Vehicles; and

**WHEREAS** previously, the Court opined that this early stage of litigation is not the time to choose which law shall apply to the common law claims in this case, and the Court will stand by that position now. (*Id*. at 20.) Accordingly, the Motion is hereby **DENIED** as to the common law claims in Counts 2-5, 7, and 8, and Plaintiffs are permitted to proceed on these claims; and

**WHEREAS** Plaintiffs also concede that they do not meet the 100-plaintiff threshold required to state a claim under the Magnuson-Moss Warranty Act, "MMWA," 15 U.S.C. § 2310 *et seq*. (Opp. at 1 n. 1.) Accordingly, the Motion is hereby **GRANTED** as to Count 6, and Count 6 is dismissed with prejudice; and

**WHEREAS** in response to the Court's findings that the SAC was deficient as it failed to identify specific and affirmative misrepresentations that Plaintiffs relied on to purchase the allegedly defective Class Vehicles, Plaintiffs added references to the advertising materials they allegedly reviewed at Exhibits A, B, and C to the TAC. *See* ECF 56-7; *see also* TAC ¶¶ 4-6, 31, 38, 45, 51, 55, 60, 73, 79, 85, 91. Generally speaking, the Court finds that these inclusions do not materially augment or correct the deficiencies the Court identified in the SAC. The Court will nonetheless walk through each of the remaining state statutory claims in turn; and

**WHEREAS** in Count 1, Plaintiffs Reinkraut and Solimando, on behalf of themselves and the New Jersey subclass, allege violations of the NJCFA, N.J. Stat. Ann. §§ 56:8-2 *et seq*. "To state a prima facie case under the NJCFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Lieberson v.*

*Johnson & Johnson Consumer Cos., Inc.*, 865 F. Supp. 2d 529, 538 (D.N.J. 2011) (citing *Payan v. GreenPoint Mortg. Funding, Inc.*, 681 F. Supp. 2d 564, 572 (D.N.J. 2010)).  While Plaintiffs argue that their additions to the TAC shore up their NJCFA claim, they have still failed to sufficiently plead that FCA had a duty to disclose the alleged defect.  Plaintiffs argue that FCA had a duty to disclose the defect because FCA allegedly made partial disclosures about the windshield in insurance policies, warranties, and a newsletter, but the Court does not find adequate these attenuated statements noted in Plaintiff's Opposition to be partial disclosures sufficient to allow the NJCFA claim to survive.  (Opp. at 25-27.)  The other statements Plaintiffs point to, such as statements that the vehicles were suitable for off-roading and moving through rugged terrain, amount to the same type of generalized and inactionable statements that doomed the claim in the SAC.  (*Id.*)  Accordingly, the Motion is hereby **GRANTED** as to Count 1, and Count 1 is dismissed with prejudice; and

**WHEREAS** in Count 9, Plaintiff Chapman, on behalf of himself and the Florida subclass, alleges Defendant violated the FDUTPA, Fla. Stat. §§ 501.201 *et seq*.  "The three elements of a consumer claim under FDUTPA are: '(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016)).  Courts use an objective test to determine whether an act is deceptive under FDUTPA, and "the plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Marrache*, 17 F.4th at 1098 (quoting  *Carriuolo*, 823 F.3d at 983-84). To establish an unfair practice, the plaintiff must show that it is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to

consumers.'" *Marrache*, 17 F.4th at 1098 (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)))). Under the FDUTPA, actual damages "are measured according to 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Carriuolo*, 823 F.3d at 986 (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)). A plaintiff, however, cannot state a cause of action under FDUTPA if the consumer fails to plead that they suffered actual damages. *Marrache*, 17 F.4th at 1098 (citing *Macias v. HBC of Florida, Inc.*, 694 So. 2d 88, 90 (Fla. Dist. Ct. App. 1997)) (holding that plaintiff failed to state a cause of action under FDUTPA as she suffered no actual damages and affirming dismissal of complaint with prejudice). While Chapman makes reference to specific advertisements that he allegedly viewed as part of his online research before purchasing his car, he fails to cure the deficiencies of his pleading in the SAC. Here, as in the SAC, "Chapman alleges no facts identifying an unfair practice or deceptive act and instead makes conclusory allegations. Furthermore, he states that his insurance paid for the repairs." (ECF 53 at 24.) Accordingly, the Motion is **GRANTED** as to Count 10, and Count 10 is dismissed with prejudice; and

**WHEREAS** in Count 15, Plaintiff Zaugg, on behalf of himself and the Utah subclass, alleges Defendant violated the UCSPA, Utah Code Ann. §§ 13-11-1 *et seq*. The UCSPA generally "prohibits deceptive or unconscionable acts or practices by a supplier in connection with a consumer transaction." *Carlie v. Morgan*, 922 P.2d 1, 5-6 (Utah 1996) (internal quotation marks omitted). However, "the plain language of the UCSPA specifically identifies intentional or knowing behavior as an element of a deceptive act or practice." *Martinez v. Best Buy Co.*, 283 P.3d 521, 523 (Utah Ct. App. 2012). Allegations of intent under the UCSPA must be pleaded with

particularity as required by Rule 9(b). *See Goodwin v. Hole No. 4*, 2006 WL 3327990, at *7 (D. Utah Nov. 15, 2006).  In the TAC, while Zaugg makes reference to promotional materials he allegedly viewed before purchasing his vehicle, he still fails to provide the necessary background information to meet the heightened pleading standard of Rule 9(b).  *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016).  Accordingly, the Motion is hereby **GRANTED** as to Count 15, and Count 15 is dismissed with prejudice; and

  **WHEREAS** in Count 16, Plaintiff Willcutt, on behalf of himself and the Washington subclass, claims that Defendant violated the WCPA, Wash. Rev. Code §§ 19.86.010 *et seq.* The WCPA provides: "[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce are hereby declared unlawful." *Id.* § 19.86.020. An adequately pled WCPA claim contains five elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) impacting the public interest; (4) causing; (5) injury to business or property. *Ridge Training Stables v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986). A deceptive act must have the capacity to deceive or mislead the public. *See McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1097 (W.D. Wash. 2013).  In the TAC, Willcutt makes reference to promotional materials he allegedly viewed before purchasing his vehicle, but he fails to cure the deficiencies of the SAC, as he fails to sufficiently establish a causal nexus between the statements in the materials and the injury he alleges.  Accordingly, the Motion is hereby **GRANTED** as to Count 16, and Count 16 is dismissed with prejudice; and

  **WHEREAS** in Count 17, Plaintiff Secco, on behalf of himself and the Virginia subclass, alleges Defendant violated the VCPA. To state a claim under the VCPA, a plaintiff must allege "(1) fraud, (2) by a supplier, (3) in a consumer transaction." *Nahigian v. Juno Loudoun*, 684 F.

Supp. 2d 731, 741 (E.D. Va. 2010). To demonstrate fraud for a VCPA claim, a plaintiff must show "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Id.* at 738 (internal quotation marks omitted). In the TAC, Secco fails to sufficient allege that the promotional materials he viewed amounted to false representations of the quality and safety of Jeep windshields. Accordingly, the Motion is hereby **GRANTED** as to Count 17, and Count 17 is dismissed with prejudice; and

**WHEREAS** in Count 18, Plaintiffs Linda and John Kotos, on behalf of themselves and the Indiana subclass, allege Defendant violated the IDCSA, Ind. Code §§ 24-5-0.5-1 *et seq*. "The IDCSA 'provides remedies to consumers and the attorney general for practices that the General Assembly deemed deceptive in consumer transactions.'" *Davis v. Contactability.com, LLC*, No. 16-02999, 2017 U.S. Dist. LEXIS 12926, at *3-4 (S.D. Ind. Jan. 31, 2017) (quoting *McKinney v. State*, 693 N.E.2d 65, 67 (Ind. 1998)). The IDCSA provides for two kinds of actionable deceptive acts: "uncured" and "incurable" acts. *Davis*, 2017 U.S. Dist. LEXIS 12926, at *4 (citing *McKinney*, 693 N.E.2d at 68). To state a claim for an uncured deceptive act under the IDCSA, a plaintiff must provide "not only a complete description of the actual damage suffered, but also a description of the alleged deceptive act . . . so that the supplier has an opportunity to correct the problem." *Davis*, 2017 U.S. Dist. LEXIS 12926, at *4 (quoting *A.B.C. Home & Real Estate Inspection, Inc. v. Plummer*, 500 N.E.2d 1257, 1262 (Ind. Ct. App. 1986)). An incurable act is done "as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8). "Intent to defraud or mislead is thus clearly an element of an incurable deceptive act." *McKinney*, 693 N.E.2d at 68. In the TAC, while Linda and John Kotos point to promotional

23

materials they viewed that they allege are deceptive, they have failed to sufficiently plead that FCA acted with intent to defraud in promulgating these materials.  Accordingly, the Motion is hereby **GRANTED** as to Count 18, and Count 18 is dismissed with prejudice; and

  **WHEREAS** in Count 19, Plaintiff Wilson, on behalf of himself and the Texas subclass, claims Defendant violated the TDTPA, Tex. Bus. & Comm Code §§ 17.41 *et seq*.  "To state a TDTPA claim, a plaintiff must allege that: (1) he is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a producing cause of the consumer's damages." *Diez v. Google, Inc.*, 831 F. App'x 723, 724 (5th Cir. 2020). "[C]ourts have consistently applied [Federal Rule of Civil Procedure] 9(b)'s heightened pleading standard to . . . Texas Deceptive Trade Practices Act [ ] claims." *Gonzalez v. State Farm Lloyds*, 326 F. Supp. 3d 346, 350 (S.D. Tex. 2017).  In the TAC, while Wilson makes reference to promotional materials he allegedly viewed before purchasing his vehicle, he still fails to provide the necessary background information to meet the heightened pleading standard of Rule 9(b).  Accordingly, the Motion is hereby **GRANTED** as to Count 19, and Count 19 is dismissed with prejudice; and

  **WHEREAS** in Count 20, Plaintiff Morris, on behalf of himself and the Maryland subclass, claims violations of the MCPA, Md. Code Ann., Com. Law §§ 13-301, *et seq*. To state a claim under the MCPA, a plaintiff must allege (1) an unfair or deceptive practice or misrepresentation that is (2) relied upon and (3) causes him actual injury. *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 319 (D. Md. Feb. 20, 2014) (citing *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007)).  Despite the addition of the facts regarding the promotional materials Morris allegedly viewed before purchasing his vehicle, Morris's pleading in the TAC fails to differ meaningfully from his pleading in the SAC, and his claim thus fails for the same reasons stated in

the Court's prior Opinion.  (ECF 53 at 29.)  Accordingly, the Motion is hereby **GRANTED** as to Count 20, and Count 20 is dismissed with prejudice; and

**WHEREAS** Plaintiff Medina alleges that Defendant violated the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750 *et seq*. (Count 10), Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Count 11), and the False Advertising Law (FAL), Cal. Bus. & Prof. Code §§ 17500 *et seq.* (Count 12). Under the FAL, the CLRA, and the fraudulent prong of the UCL, conduct is considered deceptive or misleading if the conduct is "likely to deceive" a "reasonable consumer." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Because the same standard for fraudulent activity governs all three statutes, courts often analyze the three statutes together. *See, e.g.*, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F.Supp.2d 942, 985 (S.D. Cal. 2014); *In re Plum Baby Food Litig.*, No. 21-00913, 2024 U.S. Dist. LEXIS 56920, at *14-15 (N.D. Cal. Mar. 28, 2024).  The defects in Medina's pleading that the Court identified in the SAC remain uncured; while she points to specific promotional materials she viewed, she fails to establish that these materials were in any way likely to deceive a reasonable consumer.  Accordingly, the Motion is hereby **GRANTED** as to Counts 10, 11, and 12, and these Counts are dismissed with prejudice; and

**WHEREAS** in Count 13, Plaintiff Medina, on behalf of herself and the California subclass, asserts an express warranty claim pursuant to the Song-Beverly Act, Cal. Civ. Code § 1794(a). Under the Song-Beverly Act, "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation . . . under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief."  *Id.* The Song-Beverly Act is a remedial statute designed to protect consumers who have purchased products covered by

25

an express warranty. *Ruvalcaba v. Hyundai Motor Am.*, 22-01244, 2024 U.S. Dist. LEXIS 41621, at *4 (C.D. Cal. Jan. 4, 2024). The Song-Beverly Act regulates warranty terms and imposes repair and service obligations on the parties issuing the warranties. *Id.* To state a breach of express warranty claim under the Song-Beverly Act, a plaintiff must meet the following elements: (1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of attempts to repair. *Gonzalez v. Ford Motor Co.*, No. 19-652, 2019 WL 1364976, at *5 (C.D. Cal. Mar. 22, 2019) (citing *Arteaga v. Carmax Auto Superstores W. Coast, Inc.*, No. 14-1888, 2014 WL 3505527, at *3 (C.D. Cal. July 11, 2014)). In the TAC, Medina's allegations in Count 13 are essentially unchanged from the analogous allegations in the SAC. The Court finds Medina's conclusory allegations to be insufficient to state a claim for relief. Accordingly, the Motion is hereby **GRANTED** as to Count 13, and Count 13 is dismissed with prejudice; and

**WHEREAS** in Count 14, Plaintiff Medina asserts an implied warranty claim pursuant to the Song-Beverly Act. Under the Song-Beverly Act, "every retail sale of 'consumer goods' in California includes an implied warranty by the manufacturer and the retail seller that the goods are 'merchantable' unless the goods are expressly sold 'as is' or 'with all faults.'" *Mexia v. Rinker Boat Co., Inc.*, 95 Cal. Rptr. 3d 285, 289 (Cal. Ct. App. 2009) (citing Cal. Civ. Code §§ 1791.3, 1792). This implied warranty is "coextensive in duration with an express warranty which accompanies the consumer goods . . . but in no event shall such implied warranty have a duration of . . . more than one year following the sale of new consumer goods to a retail buyer." Cal. Civ. Code § 1791.1(c). Here, Medina's claim fails again for the same reason it failed in the SAC: she

alleges that the "Windshield Defect arose more than one year following the sale of her vehicle, which is outside the timeframe for an implied warranty claim under the Song-Beverly Act." (ECF 53 at 33.) The TAC thus does not sufficiently allege that the Windshield Defect was a latent defect. Accordingly, the Motion is hereby **GRANTED** as to Count 14, and Count 14 is dismissed with prejudice.

Accordingly, Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part**. A court may dismiss a claim with prejudice when leave to amend would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). A finding that leave to amend would be futile is proper when "the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 514 (E.D. Pa. 2018) (Baylson, J.) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)). Here, Plaintiffs have had multiple opportunities to amend their Complaint and a further opportunity to amend would be futile. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:    Clerk
cc:        Cathy L. Waldor, U.S.M.J.
            Parties

27